# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-KA-01339-SCT

*STATE OF MISSISSIPPI, HARRISON COUNTY DISTRICT ATTORNEY'S OFFICE AND STATE OF MISSISSIPPI CRIME LABORATORY*

*v.*

*BRANDON C. BLENDEN*

### CONSOLIDATED WITH

### NO. 97-KA-00073-SCT

*BRANDON C. BLENDEN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/28/96 |
| TRIAL JUDGE: | HON. JOHN H. WHITFIELD |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  LAWRENCE ARTHUR SCHEMMEL |
| ATTORNEYS FOR APPELLEE: | ROGER WAYNE WOODALL |
| | KAREN J. YOUNG |
| | JOSEPH R. MEADOWS |
| DISTRICT ATTORNEY: | CONO CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 6/24/1999 |
| MOTION FOR REHEARING FILED: | 7/1/99; denied 01/13/2000 |
| MANDATE ISSUED: | 01/20/2000 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. We have for review the imposition of monetary sanctions against the State and a political subdivision for a discovery violation which necessitated a mistrial in a criminal case and is the occasion for the defendant's double jeopardy claim. We conclude that the record was sufficient to support the trial court's determination that the State committed discovery violations and that the trial court's imposition of sanctions did not violate

the separation of powers doctrine. We also find that the retrial did not subject the defendant to double jeopardy. Accordingly, we affirm the defendant's conviction, and we affirm the trial court's judgment imposing monetary sanctions.

## I.

¶2. On June 23, 1995, Brandon C. Blenden ("Brandon") was indicted on charges of felony DUI resulting in the death of a child. A sample of Brandon's blood was taken shortly after the accident. The Mississippi Crime Laboratory's toxicology department (the "Crime Lab") tested the blood sample in order to determine its blood-alcohol content. The test involved the use of a Gas Chromatograph machine. In utilizing this machine the Crime Lab purchases "known standards," which are solutions of known concentrations of alcohol, ranging in concentrations from .05% to .40%. These known solutions are to be used to calibrate the Chromatograph machine and each time an analysis is performed, to ensure the machine is operating properly. Prior to trial the defense filed various motions requesting discovery regarding the operation, calibration and/or repair history of the machine used to measure the blood-alcohol content of Brandon's blood.

¶3. The first trial commenced on June 24, 1996. During the trial Sam Howell ("Howell"), the forensic toxicologist who supervised the Crime Lab's Toxicology Department, was called to testify as to Brandon's blood-alcohol content at the time the blood sample was taken. Howell stated that the "known standards" used to calibrate the machine were checked against "known standards" of the same concentration, but which were purchased from different suppliers. Howell also testified that, while he had analyzed the results of the test, Archie Meashan Hales ("Hales"), a technician in the Toxicology Department, actually sampled the blood and placed it in the machine. Howell was not present when Hales sampled Brandon's blood. Rather, Howell analyzed the results after the tests were run by Hales.

¶4. Based on Howell's testimony the defense claimed that the prosecution had committed discovery violations and moved for a mistrial. The defense alleged that prior to trial the prosecution had disclosed the name of only one supplier of the "known standard"and had failed to disclose the names of the other two suppliers or the fact that the "known standards" were compared to determine if they were accurate. The defense also claimed that it was entitled to a mistrial because the prosecution's failure to reveal that Hales did the actual sampling of the blood and ran the Chromatograph machine, violated Brandon's right to confrontation. This motion for a mistrial was overruled by the trial court.

¶5. Next the defense moved to have the State reopen its case and put Hales on the witness stand so that Brandon could confront and cross-examine him as to the blood tests he performed. The defense also moved to strike the testimony of Howell regarding the results of the blood tests on the grounds that without Hales's testimony a proper foundation had not been laid for Howell's testimony. The trial court granted the motion to have the State reopen its case, but reserved ruling on the motion to strike until after Hales had testified. As a result the defense withdrew its motion to have the State reopen its case. The State then made its own motion to reopen its case in chief for the purpose of having Hales testify, which the trial court granted.

¶6. Once on the stand, Hales testified that he had sampled Brandon's blood and placed the sample in the Chromatograph. Hales stated that in testing the blood he followed the Crime Lab's established procedures. These procedures were set out in a document entitled the Headspace Blood Alcohol Procedures (the "Procedures"), which were developed and prepared by Howell. Hales also transferred the data regarding

the known standards from the computer-generated printout onto another document, called a sequence file, and discarded the computer printout. After the testing was complete, Hales gave the results to Howell for analysis.

¶7. On cross-examination the defense asked Hales to read the Crime Lab's Procedures. Steps one through three read as follows:

> Step 1. Sample 100 microliters of the standard, control, volatile mix, blank, or unknown blood sample followed by one milliliter of internal standard using Abbott pipettor/dilutor or equivalent. Dispense into a 20 ml autosampler vial. Cases are sampled in duplicate.

> Step 2. Place rubber septum in crimp top and crimp tightly.

> Step 3. Load samples into autosampler tray. Program sequence file to accommodate standards, controls, blanks, volatile mix, and cases for current run and save.

In response to further questioning by the defense Hales testified that the "standards," referenced in step three, were plural because they referred to different concentrations of known standards. Hales also stated that when Brandon's blood was tested they did not use multiple standards of differing concentrations; the only known standard used had a .15 percent concentration. However, multiple standards of differing concentrations were used when the machine was calibrated several days before Brandon's blood was tested. Hales also testified that he did not remember whether he was the Crime Lab employee who had calibrated the machine prior to Brandon's blood being tested.

¶8. At the conclusion of Hales's testimony, the defense renewed its motion for a mistrial. The defense asserted that they were further entitled to a mistrial because of the Crime Lab's failure to follow its own procedures by not using multiple standards of different concentrations when Brandon's blood was tested and because the prosecution failed to disclose the name of the person who had calibrated the machine prior to the blood being tested. The defense also moved to have the test results excluded under the best evidence rule because the computer-generated printouts had been destroyed. The trial court granted Brandon's motion for a mistrial on the grounds that the prosecution's failure to identify the person who calibrated the machine violated Brandon's right to confront all persons in the Crime Lab who had anything to do with testing his blood.

¶9. After the declaration of a mistrial Brandon filed a motion for sanctions, which was heard on July 19, 1996. The motion claimed that State's discovery violations made the mistrial unavoidable, and as such the State should be required to reimburse Brandon for expenses incurred in bringing the first trial. The defense also moved that the blood tests be excluded from consideration during the retrial. The defense further moved to have the case dismissed, arguing that a retrial would constitute double jeopardy. It was also revealed during the hearing that, although the witness sequestration rule had been invoked, Hales had been in the court room during Howell's testimony. The prosecution became aware of this fact prior to putting Hales on the witness stand, but it failed to inform the trial court of the violation.

¶10. After the hearing the trial court denied the defense's motion to dismiss the case on double jeopardy grounds. However, the trial court granted the defense's motions for sanctions and to exclude the blood tests in the retrial. The trial court found that the crime lab failed to follow its policy for using multiple standards of differing concentrations; neither Howell nor Hales knew who had calibrated the machine until after the State

had rested; and that the actions of the Crime Lab were intentional or so grossly negligent that they amounted to intentional acts. The trial court further found that the discovery violations forced the declaration of a mistrial in the first trial.

¶11. At a subsequent hearing, on September 24, 1996, on the State's motion to reconsider, Hales testified once again. Hales noted that he had in fact calibrated the machine, a fact which he discovered after having an opportunity to review the sequence log from the calibration. Hales also attempted to clarify his prior testimony regarding the definition of "standards" (plural) as referenced in the Crime Lab's Procedures. Hales stated that although the word "standards," in step three above, referred to different concentrations, it could also mean the use of the same concentration multiple times. When asked by the defense why Hales did not tell the court about this during the trial, Hales testified that he did not know that there was a misunderstanding as to his definition of a standard. Hales also testified that he was following standard Crime Lab procedures when he destroyed the printouts regarding the known standards, even though the written Procedures did not state that the printouts on known standards were to be destroyed. Additionally, Howell testified at the hearing that he had authored and prepared the Crime Lab's standard operating procedures and that the procedures did not require the retention of the printouts generated for the known standards.

¶12. Brandon also pointed out that his copy of the sequence file printout, which was purported to be a true and correct copy, had various material information redacted. Howell had "whited out" his initials and the initials of Hales and information related to other blood samples. Howell stated that by so doing he was deleting all information which he felt was irrelevant to this particular case.

¶13. On September 30, 1996, the trial court entered an order overruling the State's motion to reconsider. In so ruling the trial court found that the testimony of the Crime Lab personnel was totally different from that given at the first trial; documents produced were arbitrarily altered by Howell; the Crime Lab failed to follow their procedures by using only one standard in analyzing Brandon's blood; and that it was ironic that Brandon's blood alcohol content was purported to be .15 percent, the same as the concentration of the known standard used in the analysis.

¶14. The retrial was held on October 7, 8, and 9, 1996. Brandon was found guilty at the conclusion of the retrial and was later sentenced to twenty-five years, with five suspended, in the custody of the Mississippi Department of Corrections. Afterwards, on October 28, 1996, the trial court entered a Supplemental Order for Sanctions, finding that the actions of the Mississippi Crime Lab, by and through its employees, were intentional and resulted in the alteration of documents which were crucial to the defense. The trial court held that the Crime Lab's personnel committed affirmative acts of concealment and misrepresentation. The trial court further held that the acts of the Crime Lab's personnel caused the defense unnecessary expense in the amount of $28,268.65. The trial court then entered a Judgment for that amount against the Harrison County District Attorney and the State of Mississippi.

¶15. On a motion for clarification, at which the Harrison County Board of Supervisors put in an appearance, the trial court also found that the Harrison County District Attorney's Office was ultimately responsible for the acts of the Mississippi State Crime Lab and that the burden to pay the sanctions fell on the Harrison County Board of Supervisors. So finding the trial court imposed monetary sanctions in the amount of $28,268.65, jointly and severally against the State of Mississippi, for the acts of the Crime Lab, and against Harrison County, for the acts of the District Attorney's Office. Aggrieved the State of Mississippi, the District Attorney's Office and the Crime Lab appeal the imposition of sanctions. That case

is consolidated with Brandon's appeal of his conviction on a double jeopardy claim. The Harrison County Board of Supervisors also filed Amicus Curiae briefs.

## II.

¶16. "The standard of review when a trial court institutes sanctions for discovery abuses is 'whether the trial court abused its discretion in its decision.'" ***Kinard v. Morgan**, 679 So. 2d 623, 625 (Miss. 1996)* (quoting ***Cooper v. State Farm Fire & Cas. Co.***, 568 So. 2d 687, 692 (Miss. 1990) (quoting ***Brown v. Arlen Management Corp.***, 663 F.2d 575, 580 (5th Cir. 1981))). The lower court's imposition of sanctions will be affirmed in the absence of a "'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.'" ***Id.***

## A.

¶17. The Harrison County District Attorney's Office, the Mississippi Crime Laboratory, and Harrison County (hereinafter collectively "the State") claim that the findings of the trial court are not supported by the record. In its various orders the trial court found that the sanctions imposed were warranted due to the prosecution's numerous discovery violations, the violation of the sequestration rule, and the Crime Lab's failure to follow its standard procedures for analyzing blood-alcohol content. First, the trial court found that the State violated discovery by failing to disclose that Hales, not Howell, had actually sampled Brandon's blood and had run the blood sample through the Chromatograph machine. The trial court also found that the State failed by not including Hales's name on the State's witness list. The trial court based it findings on ***Kettle v. State***, 641 So. 2d 746 (Miss. 1994). In ***Kettle*** this Court held that where a defendant raises a Sixth Amendment right to confrontation objection in a case such as the one at bar, the defendant is entitled to have the technician who conducted the laboratory test testify. ***Id.*** at 750. *See also **Gossett v. State***, 660 So. 2d 1285, 1296 (Miss. 1995) (holding that it was"error to admit the autopsy report without producing the author").

¶18. The prosecution argues that Hales was not included on the State's witness list because the State had no intention or need to call Hales as a witness prior to trial, because generally the supervisor or the individual who actually analyzed the blood tests was the one to testify in court. The State also argues that Brandon knew of Hales and his likely role in the case long before trial and could have investigated who placed the blood in the machine and turned it on. On March 21, 1996, the defense requested identification of the Chromatograph operator with the initials AMH. On March 28, 1996, during a pre-trial motion hearing, the State affirmatively represented that Hales (AMH) was not involved in testing Brandon's blood. The State stated that "Archie Hales, had nothing to do with the test of this." Although the trial court ordered the State to produce a Curriculum Vitae on Hales, it would be inane to require Brandon to pursue further discovery regarding Hales's involvement in testing his blood in light of the State's affirmative representations.

¶19. Even assuming, *arguendo*, that the State did not act intentionally, it was at least negligent in failing to determine whether Hales had actually sampled Brandon's blood. "When counsel's carelessness causes his opponent to expend time and money needlessly, it is not an abuse of discretion for the court to require offending counsel to pay for his mistake." ***Vicksburg Refining, Inc. v. Energy Resources Ltd.,*** 512 So. 2d 901, 902 (Miss.1987). *See also **Ladner v. Ladner***, 436 So. 2d 1366, 1370-71 (Miss. 1983) (it is within the court's discretion to impose sanctions for discovery violations which result from willful neglect, willful disobedience or cause undue advantage and surprise). *See generally **Maine v. Mylon***, 462 A.2d 1184, 1186 (Maine 1983) (holding that trial court has wide discretion in imposing sanctions for discovery

violations in a criminal trial, even where the violation was not caused willfully); ***Maine v. Dionne***, 505 A.2d 1321, 1324 (Maine 1986); ***Bankatlantic v. Blythe Eastman Paine Webber, Inc.***, 12 F.3d 1045, 1049 (11th Cir. 1994) (monetary sanctions may be imposed in a civil action for negligently violating discovery). Therefore, the trial court did not err in finding that the State violated discovery by failing to disclose Hales's involvement in testing Brandon's blood.

¶20. Second, the trial court found that the State violated discovery by failing to provide Brandon with the names of all companies which had supplied the known standards to the crime lab. During the trial Howell testified that in calibrating the Chromatograph machine the Crime Lab sampled each concentration of known standard three times and that the samples for a given concentration was supplied by three different companies. The defense moved for a mistrial based on the grounds that information regarding the suppliers of known standards, which was requested prior to trial, had not been disclosed. The defense read a request for production to the trial court, which sought information regarding any of the Crime Lab's calibration procedures. The trial court asked Howell, without allowing him to explain, whether the request should have resulted in the production of the names of the suppliers of known standards. Howell answered affirmatively.

¶21. The State argues that given a chance Howell would have explained that the request for production, when read in context, revealed that the defense was requesting information pertaining to a breath analysis machine, not information on the Chromatograph machine. The State is correct in claiming that the only "machine" referenced in the defense's request for production was a breath analysis machine, not the Chromatograph machine. In fact the defense only read a portion of the above request for production to the trial court. In the last sentence of the request the defense specifies that it is seeking information regarding Intoxilyzer machines.

¶22. However, in a supplemental motion to produce the defense requested the production of documents relating to the calibration and repair history of any machines or instruments utilized in measuring Brandon's blood-alcohol content. The supplemental request is sufficiently similar to the request read to the trial court that it should have resulted in the production of all the names of the suppliers of known standards used in calibrating the Chromatograph machine.

¶23. During the trial the State asserted that all of the names of the various suppliers of known standards was contained in the Procedures, which had been produced to Brandon. However the trial court found that the "Crime Laboratory personnel wholly failed to give *meaningful* discovery to the Defendant relevant to the standards or solutions requested in discovery and buried the calibration information it did provide in discovery provided in such a manner as to render the same virtually useless by the Defendant in this case..." The Procedures state that in calibrating the machine "a calibration curve is generated from the results of aqueous standards." The Procedures also list various "reagents, standards, and controls" and the suppliers from which they can be obtained. However, the Procedures do not state which aqueous standards are to be used in calibrating the machine or that known standards from three different suppliers are compared for accuracy. Therefore, the trial court did not err in finding that the manner in which the names of suppliers were disclosed was meaningless and resulted in a discovery violation.

¶24. Third, the trial court found that the State failed to disclose who had calibrated the Chromatograph until after a mistrial had been declared in the first trial. The chemical analysis of a person's breath, blood, or urine is only valid where it can be determined (1) that the proper procedures were followed; (2) the operator of the machine was properly certified to perform the test; and (3) the accuracy of the machine was properly

certified. *McIlwain v. State*, 700 So. 2d 586, 590 (Miss. 1997) (citing *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)). The person calibrating the machine need not be called to testify and be subjected to cross-examination unless the certification is not presented or there is an issue raised as to the authenticity of the certification. *Id.* at 591. Here, no certificates were produced regarding either the qualifications of the person who calibrated the machine or as to the calibration of the machine. In the absence of these certifications Brandon was entitled to cross-examine the person who calibrated the machine prior to his blood being analyzed. Therefore, the trial court was correct in finding that the failure to identify Hales as the person who calibrated the machine resulted in a violation of discovery.

¶25. Fourth, the trial court found that further discovery violations occurred by the redaction of material information from Crime Lab documents submitted to Brandon in response to requests for production. In the discovery context the purpose for redacting a document is to remove that information which a party is not entitled to discover such as confidential or privileged information. *See Lyon v. Dunne*, 580 N.Y.S.2d 803, 804 (App. Div. 1992). Howell testified that, according to his regular practice, he redacted the sequence file prior to production in order to remove any confidential information or any information which he felt was irrelevant to this particular case. The information redacted included Howell's and Hales's initials. The sequence file was redacted in such a manner that the alterations were not readily apparent. Even if the information regarding blood samples other than this defendants may have been undiscoverable, the State does not claim a privilege protecting the initials of Howell and Hales from discovery. Howell claims that he had no reason for deleting the initials from the sequence file because that information had previously been produced. However, the Crime Lab's failure to produce the initials on the sequence file perpetuated the misrepresentation that Hales was not involved in testing Brandon's blood.

¶26. The trial court also found that there was a violation of the sequestration rule and that the State failed to inform the court of the violation prior to putting the witness on the stand. "The question of whether or not a violation of a sequestration order occurred is a question of fact for the trial court and will not be overturned on appeal where the determination is supported by sufficient credible evidence." *Commonwealth v. Stinnett*, 514 A.2d 154, 162 (Pa. Super. Ct. 1986)(citing *Commonwealth v. Smith*, 346 A.2d 757 (Pa. 1975)). After Howell testified that his opinion relied on the results of tests performed by Hales, upon the State's motion to reopen its case in chief, Hales was called to testify regarding testing Brandon's blood. Subsequently, on July 19, 1996, during a motion hearing, it was brought to the trial court's attention that Hales took the witness stand after having sat through Howell's testimony. Upon inquiry by the trial court, the State admitted that, prior to calling Hales to the stand, they became aware that Hales had sat through Howell's testimony.

¶27. The State argues, however, that any violation of the sequestration rule was non-prejudicial and was cured by the defense's cross-examination of Hales. And, in any event, did not warrant either granting a mistrial, excluding the blood-alcohol evidence in the second trial, or imposing monetary sanctions. This Court has held that the possible remedies for violations of the sequestration rule include:

> prohibiting the witness from testifying, striking his testimony, citing him for contempt, or allowing a "full-bore" cross-examination. *Gerrard v. State*, 619 So.2d 212, 217 (Miss.1993). It is within the trial judge's discretion to determine what remedy is appropriate. *Baine v. State*, 606 So.2d 1076, 1083 (Miss.1992).

*Brown v. State*, 682 So. 2d 340, 347 (Miss. 1996). Here the trial court found that the exclusion of Hale

as a witness left a void concerning the calibration of the machine and the chain of custody and created constitutional confrontation problems, requiring the exclusion of the blood test results in toto. Therefore, the trial court did not abuse its discretion in excluding the evidence from the retrial.

¶28. The trial court further found that the State Crime Lab failed to follow its Procedures, which required the use of multiple known standards of differing concentrations in analyzing a blood sample. Miss. Code Ann. § 63-11-19 (1996), authorizes the Crime Lab to approve the methods to be used for analyzing blood-alcohol content. This Court has recognized that an agency's interpretation of its own standards and regulations is controlling, unless such an interpretation is clearly erroneous. ***Tower Loan of Mississippi, Inc. v. Mississippi State Tax Comm'n***, 662 So. 2d 1077, 1080-81 (Miss. 1995) (citing ***Board of Trustees of State Institutions of Higher Learning v. Sullivan***, 763 F.Supp. 178, 184 (S.D. Miss.1991)). *See also*, ***United Steelworkers v. Marshall*** 647 F.2d 1189, 1228 (D.C. Cir. 1981) (citing *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L. Ed.2d 48 (1977)); ***United States v. Scholz***, 19 M.J. 837, 842 (N-M.C.M.R. 1984). Here the trial court found that the Crime Lab failed to follow the procedures as set out in its Procedures. This finding was based on the fact that the Crime Lab used a standard of only one concentration level in testing Brandon's blood. During the first trial the following exchange took place on cross-examination:

> Q. [Defense] Okay. So on step three, we talk about standards plural, do we not, standards with an S, and in step one, we talk about an internal standard, singular; is that correct?
>
> A. [Hales] That's correct. Those are two different terms.
>
> Q. So when you talk about standards, plural, you're talking about solutions that are of different alcohol concentrations, right?
>
> A. That's correct, of known concentration.

¶29. During a subsequent hearing on the State's motion to reconsider, Hales attempted to clarify his previous testimony by stating that "standards" also referred to the use of the same standard multiple times, as was done in this case. When asked by the defense why Hales did not tell the court about this during the trial, Hales testified that he did not know that there was a misunderstanding as to his definition of a standard. Additionally, Howell testified that he wrote the Crime Lab's Procedures and that by analyzing the results of the tests, which showed only one concentration of standard as being used, he had determined that Hales had performed the tests pursuant to the Crime Lab's Procedures. The defense presented no other expert testimony regarding the interpretation of the Procedures, instead relying on Hales testimony during the trial that "standards" - plural- referred to different concentrations of standards. Even if Hales's testimony was contradictory, Howell's interpretation of the Procedures, that only one concentration of standard was required when analyzing a blood sample, was entitled to deference. ***Tower Loan of Mississippi, Inc. v. Mississippi State Tax Com'n***, 662 So. 2d 1077, 1080-81 (Miss. 1995). There is no showing that Howell's interpretation is clearly erroneous. Nevertheless, the apparent agency vacillation on this issue is sufficient justification for the trial court consider this factor in the context of the overall circumstances when determining whether to impose sanctions.

¶30. The trial court found that the acts of the crime lab were intentional, forced the defense to request a mistrial and were chargeable to the State of Mississippi. Where material evidence within the knowledge of a governmental officer has been withheld from the defense, that knowledge is imputed to the prosecutor,

regardless of the fact that the governmental officer with actual knowledge is from a different governmental agency. *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979). *See also* *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S.Ct. 763, 766 (1972). Such knowledge is also imputable to the prosecution regardless of the good or bad faith of the prosecutor. *Antone*, 603 F.2d at 569. In this case the District Attorney's office and the Mississippi Crime Laboratory are both state agencies. Howell, from the Mississippi Crime Lab, redacted discoverable information from documents and failed to disclose the names of suppliers of known standards.

¶31. Even though the trial court did not err in finding that the State had committed discovery violations thereby causing the mistrial, the inquiry can not stop there, it must also be determined whether the trial court had the authority to impose monetary sanctions against the State.

**B.**

¶32. The State raises the issue of whether the trial court abused its discretion by imposing sanctions. Where the prosecution attempts to introduce evidence which has not been timely disclosed the defense should be given a reasonable opportunity to review the evidence. URCCC 9.04(I) (1998). If, after review the "defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial." URCCC 9.04(I) (1998).

¶33. The sanctions of excluding the evidence or granting a continuance or a mistrial are not the only sanctions within the trial court's discretion to impose. Nor, is the trial court limited in the imposition of sanctions to only one form of sanction. Additionally or alternatively, discovery violations may subject an attorney in a criminal trial to monetary sanctions either under the provisions of URCCC 1.03 ("[a]ny person embraced within these rules who violates the provisions hereof may be subjected to sanctions, contempt proceedings or other disciplinary actions imposed or initiated by the court."), URCCC 9.04 (willful violations may result in sanctions), or under the trial court's inherent authority to control proceedings before it. This Court, in *Selleck v. S.F. Cockrell Trucking, Inc.*, 517 So. 2d 558, 560 (Miss. 1987), stated as follows:

> In *Ladner v. Ladner*, 436 So. 2d 1366, 1370 (Miss.1983), we held that even where there is no specific statutory authority for imposing sanctions, courts have an inherent power to protect the integrity of their processes, and may impose sanctions in order to do so. More recently, in *Vicksburg Refining, Inc. v. Energy Resources Ltd.,* 512 So. 2d 901 (Miss.1987), we held that "[w]hen counsel's carelessness causes his opponent to expend time and money needlessly, it is not an abuse of discretion for the court to require offending counsel to pay for his mistake, especially where ... out-of-town travel was involved." *Id.* at 902. In the case at bar, we conclude that where a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney's fees and expenses should be awarded to the wronged party. Although not all misconduct would warrant such an award, *Aeroglide Corporation v. Whitehead*, 433 So. 2d 952 (Miss.1983)...

¶34. Harrison County argues that the expenditure of public funds is strictly a legislative function and that the trial court's ruling that Harrison County is responsible for paying the monetary sanctions is a violation of the separation of powers doctrine. This State's Legislature has expressed its intent to cloak this State and its political subdivisions in sovereign immunity by providing that the State of Mississippi is not subject to

liability for the wrongs of its employees while acting within the scope of their duties. Miss. Code Ann. § 11-46-3 (Supp. 1998). The Legislature has waived immunity for "claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment." Miss. Code Ann. § 11-46-5 (Supp. 1998). Even where immunity is waived, the awarding of attorneys fees is prohibited unless specifically authorized by law. Miss. Code Ann. § 11-46-15(2) (Supp. 1998). The Legislature has provided that costs and attorney's fees may be awarded against a party for litigation abuses, in *civil* cases. Miss. Code Ann. § 11-55-5 (Supp. 1998). Miss. Code Ann. § 11-55-11 (Supp. 1998), further provides that § 11-55-5 applies "in all cases unless attorney's fees are otherwise specifically provided by statute or court rule, in which case the provision allowing the greater award shall prevail." However, § 11-55-11 is not applicable in the context of a criminal case.

¶35. Nonetheless, this Court finds that the Legislative intent was not to immunize against lawfully imposed sanctions in criminal cases. Rather by enacting § 11-46-3 the Legislature sought to prevent a party from bringing the State into court and thereby subjecting the State to judicial authority without the State's permission. In this case, however, the State came into the judicial arena willingly.

¶36. A number of federal courts have held that absent an express waiver of sovereign immunity, the judiciary is without authority to assess monetary sanctions against the government. *United States v. Woodley*, 9 F.3d 774, 781 (9th Cir. 1993); *Graham v. United States*, 981 F.2d 1135, 1141-42 (10th Cir. 1992). Congress has enacted statutes which provide for the imposition of judicial monetary sanctions. *See* *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1179 (Fed. Cir. 1993) ("[Equal Access to Justice Act] § 204(a), 28 U.S.C. § 2412(b) (1998), explicitly waives the government's sovereign immunity in a civil case to an award of reasonable attorney fees..."); *United States v. Ranger Electronic Communications, Inc.*, 22 F. Supp. 2d 667, 674 (W.D. Mich. 1998) ("In adopting the Hyde Amendment, Congress made criminal fee requests subject to the procedures and limitations utilized by civil litigants under the Equal Access to Justice Act..."). The Ninth Circuit has also held that even where a statutory waiver of immunity is inapplicable, sanctions may be imposed under the Federal Rules of Civil Procedure. Where a Rule expressly provides that a court may impose monetary sanctions, *Woodley*, 9 F.3d at 781, in so far as that particular Rule is concerned, the government waives immunity by coming into the court as a party, *Mattingly v. United States*, 939 F.2d 816, 818-19 (9th Cir. 1991) (cited with approval in *Woodley*, 9 F.3d at 781). Conversely, the Ninth Circuit held that monetary sanctions were not available under the Federal Criminal Rule of Procedure 16(d)(2), in which there is no express provision for the imposition of monetary sanctions. *Woodley*, 9 F.3d at 781.

¶37. Although a Mississippi court's authority to impose sanctions under it Rules is not as restrictive as that espoused in *Mattingly* and *Woodley*, in the case at bar, the trial court did not impose sanctions under any of the Rules of Civil or Criminal Procedure, but rather found that it had the authority to impose the sanctions on the basis of its inherent power to control matters which are prosecuted before it. The United States Court of Appeals for the First Circuit has addressed the issue of whether federal courts may impose monetary sanctions against the government through a court's inherent power to control matters before it. *United States v. Horn*, 29 F.3d 754 (1st Cir. 1994). That court held that:

> In this case, the doctrines of sovereign immunity and supervisory power, each formidable in its own right, are in unavoidable tension. Despite the fact that, in recent years, the domain of sovereign immunity has tended to contract and the domain of supervisory power has tended to expand, we believe that sovereign immunity ordinarily will trump supervisory power in a head-to-head

confrontation. The critical determinant is that the doctrines are of fundamentally different character: supervisory powers are discretionary and carefully circumscribed; sovereign immunity is mandatory and absolute. Consequently, whereas the former may be invoked in the absence of an applicable statute, the latter must be invoked in the absence of an applicable statute; and whereas the former may be tempered by a court to impose certain remedial measures and to withhold others, the latter must be applied mechanically, come what may. In other words, unlike the doctrine of supervisory power, the doctrine of sovereign immunity proceeds by fiat: if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity. *See, e.g.*, *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 473, 114 S.Ct. 996, 1000 (1994).

¶38. Conversely, this Court has held that the constitutional concept of separation of powers dictates that it is within the inherent power of this Court to promulgate procedural rules to govern judicial matters. *Newell v. State*, 308 So.2d 71, (Miss.1975). And "statutes which conflict with rules adopted by the Court are void."*Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993). Additionally, Miss. R. Civ. P. 1 cmt, provides that the rules apply equally to the State irrespective of any statute to the contrary. Likewise, a court's inherent power to control actions before is equally applicable to the State. When the State enters the court as a litigant, it places itself on the same basis as any other litigant; subjecting itself to the inherent authority of the court to control actions before it, just as any other litigant. "The Court may invoke this inherent authority through the adjudication of cases, the promulgation of rules, or the development of internal management practices." *Tighe v. Crosthwait*, 665 So. 2d 1341, 1347 (Miss. 1995). Here the State committed various discovery violations which resulted in the declaration of a mistrial. As a result, the trial court exercised its inherent authority to control matters proceeding before it to impose monetary sanctions on the State.

¶39. Harrison County also claims that there is no authority under Mississippi law for monetary sanctions to be imposed against a county. However, the Mississippi Constitution, art. 14, § 261 (1890), provides that "[t]he expenses of criminal prosecutions shall be borne by the county in which such prosecution shall be begun. . . ."

¶40. Harrison County argues that the judiciary is prohibited from imposing sanctions against the State, or a political subdivision thereof by the holding in *Board of Sup'rs of George County v. Bailey*, 236 So. 2d 420, 422 (Miss. 1970). *Bailey* held that "[i]t requires legislative implementation for the determination of what constitutes proper expenses, the amounts thereof or a method of making such determination, and to whom same should be paid."[1] However, *Bailey* is distinguishable from the case at bar. The trial court in *Bailey* ordered the State to pay the costs of providing legal counsel to an indigent criminal defendant. Whereas here the trial court is imposing sanctions against the prosecution for the violation of judicial procedures. As discussed *supra*, when the State, or one of its political subdivisions, enters the judicial arena as a party, the Rules apply equally to the State irrespective of any statute to the contrary. The cost of doing business, whether it be public or private, includes any fines or penalties which result from negligence or from the wilful violation of procedures. *See* Miss. Code Ann. § 27-7-7 (1991). This assignment of error is without merit.

## C.

¶41. Harrison County also claims that it was denied due process in violation of Article 3, Section 14 of the Mississippi Constitution and the Fourteenth Amendment to the United States Constitution. For authority

Harrison County cites to now Chief Justice Prather's, specially concurring opinion in *Mease v. State*, 583 So. 2d 1283 (Miss. 1991). In *Mease* this Court dealt with the issue of whether a trial court could entertain a court appointed attorney's motion for attorney's fees in excess of the statutory maximum. Relying on the holdings in *Wilson v. State*, 574 So. 2d 1338 (Miss. 1990) and *Pruett v. State*, 574 So. 2d 1342 (Miss. 1990), this Court reversed for a hearing as to the reasonable expenses incurred by the attorney. In a specially concurring opinion, in which five other Justices joined, Chief Justice Prather stated that:

> it would be prudent to have the Board of Supervisors, as the payor of claims against the county, receive notice from the Circuit Court before this type of hearing is held and have the option of allowing their attorney [to] participate in the hearing, if they so elect. . . .

583 So. 2d at 1285.

¶42. In the case at bar, Harrison County Board of Supervisors were not noticed on either the hearing on the Motion for Sanctions or on the hearing on the Supplemental Motion for Sanctions. However, the County's Board of Supervisors were notified of the hearing on the District Attorney's Motion to Clarify and were represented by counsel at the hearing. The County made no motions in relation to being allowed to cross-examine the witnesses from the previous hearings. Nor did the County complain to the trial court regarding the notice that it received. Also the County's attorney was given an opportunity to argue the County's position at the hearing. Due process is satisfied where there is notice and an opportunity to be heard. *Mississippi Power Co. v. Goudy*, 459 So. 2d 257, 271 (Miss. 1984). Harrison County was given notice and an opportunity to be heard. Therefore, this assignment of error is without merit.

### D.

¶43. On appeal Brandon raises the issue of whether the trial court erred in failing to dismiss the case on double jeopardy grounds. When a defendant moves for a mistrial he or she will be barred from later claiming a double jeopardy violation, unless it can be shown that the error at issue was committed by the prosecution with the intent of forcing the defendant to move for a mistrial. *Nicholson on Behalf of Gollott v. State*, 672 So. 2d 744, 750 (Miss. 1996). In this case, although the trial court found that the errors which necessitated the mistrial were committed by the prosecution, the trial court did not find that the prosecution committed those errors with the intent to force Brandon to move for a mistrial. This Court has held that "[i]n order to prevail on this kind of error, it is incumbent upon an appellant to show that the prosecution by its argument 'intended to 'goad' the defendant into moving for a mistrial,' or 'intended to provoke the defendant into moving for a mistrial.'" *Wheat v. State*, 599 So. 2d 963, 956 (Miss. 1992) (quoting *Oregon v. Kennedy*, 456 U.S. 667, 673, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416 (1982)). In this case Brandon failed to offer any evidence that the prosecutor had the intent to force the defense to move for a mistrial. A prosecutorial error necessitating the declaration of a mistrial does not necessarily amount to an intent to force the defendant to move for a mistrial. *Wheat*, 599 So. 2d at 956. This assignment of error is without merit.

### III.

¶44. For the above and foregoing reasons the trial court's judgments are affirmed.

¶45. **CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR CAUSING DEATH AND SENTENCE OF 25 YEARS IN THE CUSTODY OF THE**

**MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH 5 YEARS SUSPENDED AFFIRMED. BRANDON C. BLENDEN SHALL PAY RESTITUTION TO ANN AND JACK LEE IN THE AMOUNT OF $520 UNDER THE TERMS AND CONDITIONS SET OUT IN THE JUDGMENT OF THE TRIAL COURT. UPON RELEASE BRANDON C. BLENDEN IS TO BE PLACED UPON SUPERVISED PROBATION FOR 5 YEARS UNDER THE TERMS AND CONDITIONS SET OUT IN THE JUDGMENT OF THE TRIAL COURT.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., NOT PARTICIPATING.**

1. *Board of Sup'rs of George County v. Bailey*, 236 So. 2d 420 (Miss. 1970), was decided in an era of pre-*Newell* deference to the legislature in matters integral to the judicial process. *Newell v. State*, 308 So. 2d 71, 76-77 (Miss. 1975). Beginning with *Newell* and continuing through the adoption of Mississippi Rules of Civil Procedure and the Mississippi Rules of Evidence, this court has asserted its prerogative as a co-equal branch of government with plenary power over matters assigned to it for adjudication. *Id.* It is compelled to take such steps as are necessary to accord due process in accordance with the Constitution of the State of Mississippi and the Constitution of the United States. *See, e.g.*, *Jackson v. State*, 1998 WL 469953 (Miss. 1998) (ordering the provision of counsel for post-conviction relief proceedings for death penalty defendants); *Hall v. State*, 539 So.2d 1338, 1339-40, 1344-46 (Miss. 1989) ( rejecting legislative evidentiary rules); *Mitchell v. State*, 539 So.2d 1366, 1372 (Miss. 1989) (admissibility of child hearsay statements determined under M.R.E.); *City of Mound Bayou v. Roy Collins Const. Co., Inc.*, 457 So. 2d 337, 342-43 (Miss. 1984) (affirming that the notice requirements for appeal are prescribed by the Rules of Court and not legislatively); *Jackson v. State*, 337 So.2d 1242, 1253 (Miss. 1976) (prescribing procedure for the application for the death penalty after legislatively prescribed procedure was declared unconstitutional).