# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-KA-02036-SCT

*VIOLA GRAY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/1999 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | COVINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OBY THOMAS ROGERS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | EDDIE H. BOWEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/15/2001 |

**BEFORE BANKS, P.J., MILLS AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. On October 19, 1999, Viola Gray ("Viola") was convicted in the Circuit Court of Covington County, Mississippi, for the murder of her husband, Larry Gray ("Larry"), and sentenced to life imprisonment. On July 9, 1999, the trial conducted a hearing on pretrial motions. The trial court considered various motions filed by Viola including her Motion for Change of Venue.

¶2. At the hearing on the pretrial motions, the trial court confirmed that the case was set for trial on July 19, 1999, in Collins, Mississippi. The case had previously been set for July 14, 1998, and continued based upon a docket conflict. It had also been set for January 17, 1999, and continued based upon a docket conflict. However, on July 19, 1999, the case was again continued because the State had failed to produce the State Crime Lab Test results. Trial began on October 18, 1999.

¶3. On October 18, 1999, the day of the trial, Viola brought a motion for continuance based on the District Attorney Office's production of twenty-two (22) 35 millimeter photographs taken the day of the murder. The motion to continue was denied, and the trial proceeded. It is from the conviction for murder that Viola now appeals to this Court.

## FACTS

¶4. Viola and Larry were married and resided together in Covington County, Mississippi. While still married to Larry, Viola became involved with Bruce McDonald ("McDonald"). Viola and Larry had not been living together for about six months prior to Larry's death. The defense called McDonald to testify. McDonald testified that he pled guilty to accessory after the murder, receiving five years with four years

suspended. On September 12, 1997, McDonald had initially confessed to killing Larry, but he recanted the same day and gave a videotape statement to officers Don Sumrall ("Sumrall") and Darrell Woodson ("Woodson"). McDonald testified that on September 12, 1997, at about 6:30 a.m. he drove Viola to Larry's house and then drove up and down the road three times before stopping on the side of the road in front of Larry's house. McDonald honked the horn on his Volvo White GMC eighteen wheeler truck. Larry was on his carport and came toward the truck. Viola reached for the gun and took it from the cover. Larry came around the front of the truck and grabbed McDonald's door and began opening it when McDonald took the gun from Viola. McDonald kicked Larry back off the truck door and shot between Larry's legs. The first shot hit the ground. McDonald's second shot hit Larry in the leg. McDonald only fired two shots at Larry. McDonald's gun held five shots. After being shot in the leg, Larry went back across the road. McDonald got back into the truck and released the brake. Viola grabbed the gun and jumped out of the truck. Viola chased Larry and shot him three times. McDonald testified that he believed Viola shot Larry once in the back of the leg and twice while standing over him. Larry never got up from the last shot Viola fired.

¶5. McDonald testified that he then carried Viola back to her daughter's apartment to wake her kids for school and get a couple of bags of clothes. McDonald took the gun to Milton Campbell to dispose of it for him.

¶6. Jean Gray ("Jean") testified as a witness for the State. Jean testified that back in September, 1997, she was living in Mount Olive, Mississippi, located in Covington County in a trailer across the road from Larry's house. Jean had known Larry for approximately 25 years and Viola for approximately 22 years. Jean had been married to Larry's deceased brother. In September 1997, Viola and Larry were separated and were not living in the same house.

¶7. Jean testified that at approximately 6:30 a.m. on the morning in question, at daylight, she heard a horn honk. When she looked outside she saw an eighteen wheeler, without its trailer.[1] Larry came from his carport toward the truck. Jean continued to watch until Larry got to the truck. She had started back to her bedroom when she heard a gunshot. Jean heard a voice say, "I'm going to kill you, mother f_cker." Viola jumped out of the truck and ran behind Larry with the gun. Viola shot Larry while he was face down shuffling around on the ground. Viola had the gun pointed at Larry's back. Jean only saw Viola shoot Larry two times. Nothing was blocking Jean's view from her window. Larry was still alive, moving, when Jean ran to him. There was no doubt in her mind that Viola shot Larry. Jean gave her statement to the police approximately four or five days later.[2]

¶8. Dr. Steven Hayne ("Dr. Hayne"), the State Pathologist, testified on behalf of the State. Dr. Hayne performed the autopsy on Larry's body on September 12, 1997, at the Rankin County morgue in Pearl, Mississippi. Four gunshot wounds were discovered in the autopsy. Gunshot wounds were located one to the right elbow, one to the back of the right thigh, one to the front of the left thigh and one to the lower left part of the back. The bullet that entered through the back went upward through the left kidney, the stomach, and the diaphragm, striking the heart and embedding in the left chest near the left nipple. The organ damage caused extensive bleeding. The volume of blood loss was lethal, producing death by acute exsanguenation (bleeding to death). Dr. Hayne testified that it was the shot to Larry's left lower back that caused his death.

¶9. On appeal, Viola raises the following issues:

> I. **Whether the trial court erred in not granting Viola's request for a continuance when**

**twenty-two, 35 millimeter photos were produced twenty minutes after the trial was set to begin.**

**II. Whether the trial court erred in excluding newspaper article establishing the time the sun rose on the day of the crime, when same was offered to rebut the testimony of the State's witness that there was sufficient light to see the crime occur.**

**III. Whether the trial court erred in failing to grant Viola's request for a change of venue.**

<u>LEGAL ANALYSIS</u>

## I. CONTINUANCE

¶10. Before trial began on October 18, 1999, the trial court conducted a pretrial motion hearing on Viola's motion to continue. At approximately 9:20 a.m., on the day of trial, the State produced twenty-two 35 millimeter photographs of the crime scene. The photographs were marked for identification and listed as Defendant's Exhibits No. D-1 through D-22. The photographs depicted the location of the body in relationship to the other landmarks at the crime scene. These photographs had remained in the possession of Van Tuggle, a deputy with the Covington County Sheriff's Department, until the day of the trial. Deputy Tuggle had shot the pictures the day of the murder. The State had never been furnished the photographs or informed of their existence until the day of trial. The State represented to the trial court that Deputy Tuggle had informed them only that morning that he just found the photographs.

¶11. The State had previously furnished six Polaroid photographs in discovery that depicted the same body and location shown in the 35 millimeter photographs. The State argued that the 35 millimeter photographs were only duplicate photographs. The State also informed the trial court that since the 35 millimeter photographs were only received that morning that it did not intend to use them at trial. The State only furnished the 35 millimeter photographs for the defense's use.

¶12. The trial court and the attorneys had previously viewed the crime scene themselves. Viola argued to the trial court that the case should have been continued because the six photographs furnished by the State did not show any landmarks. On appeal, Viola argues that photographs might have been helpful in the preparation of her defense.

¶13. The trial court ruled on Viola's request for continuance as follows:

The Court: The new photos that were just provided this morning are D-1 through D-22, inclusive for identification. I've looked at the photos. I see nothing in D-1 through D-22 that would change the Defendant's defense. Of course, they show slightly different angles of the body and are taken at different distances from the body than those pictures that show the body, the "S" numbered exhibits. So the motion for continuance is denied. The motion in limine, however, is granted, and the State is hereby precluded from offering D-1 through D-22 for identification. Of course, the Defendant is free to use them if he chooses or if she chooses. Pardon me.

Defense: Your Honor, in addition to that, we would also ore tenuously file another motion regarding precluding the State from using what has been identified as S-1 through S-6. The basis of that motion is that these, if the photographs that have been identified as Defendant's identification 1 through 22, if they had been produced, we may have taken a different approach to this case. Because in S-3

through S-6, which are the Polaroid's that the State intends to produce, show no, there's no reference to major landmarks, and a big issue in this case is going to be an eyewitness who comes up, you know, nearly seven days later and says, you know, I saw it, and it's going to be an issue because the Court had already allowed us or is going to allow us to go out and see the scene. But these photographs that were produced today do show the body in relationship to major landmarks.

The Court: And are you saying by these, by using those photos it could change your defense?

Defense: It could, this could potentially change my defense.

The Court: How so?

Defense: If I would have been able to develop lines of questioning regarding what the -

The Court: You still can. I'm saying you can. They cannot; you can.

Defense: Right. I'm aware of that, but that also, I have no personal knowledge regarding this scene, the scene and

The Court: Now, I beg to differ there. You have been out there with me.

Defense: You are right, but I have no personal knowledge regarding the scene the day of the accident. We see it nearly a year later.

The Court: Well, I hope the jurors don't either.

Defense: Well, but I would have been able to develop a line of questioning regarding the position of the trailer, the visions of sight. But the point of my motion is that the State has been able to prepare their case based upon these photographs and to, which don't show any landmarks and to preclude me from the opportunity to develop this line of questioning.

The Court: You are not precluded.

Defense: O'kay.

The Court: You are allowed to use those photographs. You are not precluded. I repeat. You are not precluded. You are free to develop that line of questioning.

Defense: It did not, their production of these documents did not allow me a proper amount of time to develop the case. They have had two years to do it.

The Court: O'kay. Well, your motion is denied.

Defense: O'kay. Thank you.

¶14. This Court has held that the trial court's denial of a continuance should not be reversed unless it appears to have resulted in manifest injustice. *Hatcher v. State*, 617 So.2d 634, 639 (Miss. 1993).

¶15. So in order for Viola to establish that she sustained reversible error as a result of the trial court's denial of her motion for continuance, she must establish that she suffered "manifest injustice flowing from the denial

of a continuance." *See Farris v. State*, 764 So.2d 411, 425 (Miss. 2000).

¶16. Miss. Code Ann. § 99-15-29 (2000) states as follows:

> On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross.

¶17. The decision to grant or deny a continuance is left to the sound discretion of the trial court. *Johnson v. State*, 631 So.2d 185, 187 (Miss. 1994); *Wallace v. State*, 607 So.2d 1184, 1191 (Miss. 1992); *Morris v. State*, 595 So.2d 840, 840 (Miss. 1991); *Fisher v. State*, 532 So.2d 992, 998 (Miss. 1988).

¶18. On appeal, the State cites *Kolberg v. State*, 704 So.2d 1307, 1317 (Miss. 1997) in support of its position. In *Kolberg*, this Court addressed a discovery violation where the State did not furnish the defense with the information about which Dr. Vise and Dr. Galvez would later testify. *Id*. This Court in *Kolberg*, stated as follows:

> This Court has reiterated the guidelines set forth in Rule 4.06 on the procedure for when the prosecution attempt to admit evidence that was not timely disclosed. See *Holland v. State*, 587 So.2d 848 (Miss. 1991); *Cole v. State*, 525 So.2d 365 (Miss. 1987), cert. denied, *Cole v. Mississippi*, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); and *Box v. State*, 437 So.2d 19 (Miss. 1983). First, the court should allow the defense an opportunity to review the evidence. Unif. Crim. R. Cir. Ct. Practice 4.06(i)(1). Second, if the defense "claims unfair surprise or undue prejudice and seeks a continuance or mistrial," the court should exclude the evidence, grant the continuance, or grant a mistrial. Unif. R. Cir. Ct. Practice 4.06(i)(2). And, finally, the court will not be required to grant a continuance or mistrial if the State withdraws the evidence or ceases to attempt to have it admitted. Unif. R. Cir. Ct. Practice 4.06(i)(3).

704 So.2d at 1317.

¶19. In the case sub judice, the State informed the trial court and the defense that it did not intend to use the 35 millimeter photographs at trial. The State did not offer the 35 millimeter photographs at trial.

¶20. On appeal, Viola does not show how furnishing the 35 millimeter photographs earlier would have impacted her defense. As the trial court noted, Viola had been furnished six Polaroid photographs of slightly different angles of the same body. The record also reflects that the defense also had the opportunity to examine the crime scene first hand.

¶21. For the foregoing reasons, we find that this issue is without merit.

## II. NEWSPAPER ARTICLE

¶22. Viola argues that the trial court erred in not allowing her to introduce a copy of the *Hattiesburg American*, which set the time of sunrise on September 12, 1997, at 6:43 a.m. Viola contends that the

newspaper was critical to attacking Jean's credibility. Jean testified on direct examination that she heard the horn blow around 6:30 a.m. However, on cross-examination, Jean testified that she made her 911 call at 6:25 a.m., and she stated that there was "plenty of light for me to see." She testified that it was morning. The defense tried to get Jean to state that the "sun was high in the sky." Jean refused to agree with the defense's statement.

¶23. Viola's attorney questioned Jean as to the newspaper. The transcript reflects the exchange as follows:

Q. Ms. Gray, did you have an opportunity to read the paper on the day of September the 12th, 1997?

A. No, I didn't.

Q. What time did the sun rise on September the 12th, 1997?

A. I really don't know. Q. Would you disagree with me if I tell you that the paper said it arose - State: Objection, Your Honor.

The Court: Overruled. He can ask the question.

Q. Would you disagree with me if I tell you that the Hattiesburg American said that the sun rose at 6:43 a.m. on September the 12th, 1997?

A. That's Hattiesburg. That was Mount Olive. Q. But it's your testimony that - so, you would disagree with me that the sun rose at 6:43?

A. It was daylight. I could see.

Q. But would you disagree with me?

A. Yes, I would.

¶24. The trial court allowed the line of questioning as to the newspaper's stated time of sunrise. The trial court, however, did not allow the introduction of the newspaper. Viola did not supply the State with a copy of the newspaper in discovery.

¶25. The State had objected to the introduction of the newspaper itself since the defense had not produced it in discovery. The defense argued that under M.R.E. 902, the newspaper was self authenticating, and it did not need to be produced in discovery. The trial court conducted a bench conference on the record as follows in pertinent part:

The Court: I understand newspapers are self-authenticating, but the discovery issue is the one that concerns me.

State: Judge, this is exactly when *Box* came down. They attempted to cross-examine with letters that were not produced in discovery.

The Court: That's right. State: That was the exact thing, and they said, you know, what's good for the goose is good for the gander. If you intended on, you know, using this, you were required -

Defense: Well, I didn't know she was going to testify the sun was high [3] State: You knew the date of the tape was 6/25. You knew if you were going to cross-examine her about that.

The Court: Yeah. I think this falls under *Box*. I sustain the objection on the discovery violation as to using it. Whenever we send a jury home for the day though, you can make a proffer and mark it for identification purposes, but it is self-verifying. You don't have to worry about verifying a newspaper.

(Conclusion of bench conference)

¶26. This Court has stated that "the standard of review when a trial court institutes sanctions for discovery abuses is 'whether the trial court abused its discretion in its decision.'" *Kinard v. Morgan*, 679 So.2d 623, 625 (Miss. 1996) (quoting *Cooper v. State Farm Fire & Cas Co.*, 568 So.2d 687, 692 (Miss. 1990) (quoting *Brown v. Arlen Management Corp.*, 663 F.2d 575, 580 (5th Cir. 1981)). *See State v. Blenden*, 748 So.2d 77, 82 (Miss. 1999). "The trial court has considerable discretion in matters pertaining to discovery, and its exercise of discretion will not be set aside in the absence of an abuse of that discretion." *Paulk v. Hous. Auth.*, 228 So.2d 871, 873 (Miss. 1969). *See Harkins v. Paschall*, 348 So. 2d 1019, 1021 (Miss. 1977). This Court is limited on appeal to reversing a trial court's decision regarding discovery violations only upon finding an abuse of discretion. *Conley v. State*, 790 So.2d 773, 782 (Miss. 2001).

¶27. Rule 9.04 of the Uniform Rules of Circuit and County Court Practice controls discovery between both the prosecution and the defendant.[4] This rule is equally controlling as to both parties. *See Glaskox v. State*, 659 So.2d 591, 593 (Miss. 1995). Rule 9.04 (c)(2) states in pertinent part that:

> If the defendant requests discovery under this rule, the defendant shall, subject to constitutional limitations, promptly disclose to the prosecutor and permit the prosecutor to inspect, copy, test, and photograph the following information and material which corresponds to that which the defendant sought and which is in possession, custody, or control of the defendant or the defendant's attorney, or the existence of which is known, or the exercise of due diligence may become known, to the defendant or defendant's counsel:
>
> (2) Any physical evidence and photographs which the defendant may offer in evidence.

Unif. Cir. & Cty. Ct. R. 9.04.

¶28. In *Box v. State*, 437 So.2d 19, 21 (Miss.1983), this Court stated that, "prosecuting attorneys, as well as defense attorneys, must recognize the obligation to abide by discovery rules." "A rule which is not enforced is no rule." *Id*. We find that the trial judge's decision to exclude the introduction of the newspaper itself into evidence was not an abuse of his discretion. Where the wilful discovery violation gives the defense a "tactical advantage," exclusion of the evidence is entirely proper. *See Taylor v. Illinois*, 484 U.S. 400, 415, 108 S.Ct. 646, 655, 98 L.Ed. 2d 798 (1988); *Glaskox*, 659 So.2d at 594. *See also Coleman v. State*, 749 So.2d 1003, 1009-10 (Miss. 1999); *De La Beckwith v. State*, 707 So.2d 547, 575 (Miss. 1997).

¶29. The trial court properly determined that Viola had an opportunity to supply the newspaper to the State prior to trial. There was no doubt that an eyewitness would be called to testify that she saw Viola murder her husband, Larry, on the morning in question. Obviously, the witness's ability to see the crime scene at that time in the morning would be an issue at trial. The State did not have any expert or witness at trial

available to address the *Hattiesburg American's* correctness or the basis on which it determined sunrise.

¶30. Assuming arguendo that the trial court erred in not allowing the introduction of the newspaper into evidence, the error at best is harmless error. In *Catholic Diocese of Natchez -Jackson v. Jaquith*, 224 So.2d 216, 221 (Miss. 1969) (quoting 5 Am. Jur. 2d *Appeal and Error* § 776 (1962)), this Court held the distinction between harmless error and reversible error is as follows:

> To warrant reversal, two elements must be shown: error, and injury to the party appealing. Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case; it is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable, and will be reversed when there is nothing in the pleadings or evidence to support it.

The Court later stated in *Forrest v. State*, 335 So.2d 900, 903 (Miss. 1976), that "an error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." In the case sub judice, the trial court as previously stated from the record allowed defense counsel to question the witness, Jean, about the time of sunrise stated in the newspaper. The fact that the *Hattiesburg American* stated the time of sunrise on September 12, 1997, as being 6:43 a.m., came before the jury to hear and consider on deliberation. Viola was not totally prohibited from placing that information before the jury. Based on the foregoing reasons, we find that the exclusion of the newspaper by the trial court did not result in any miscarriage of justice. The issue is without merit.

### III. VENUE

¶31. Viola contends that the circumstances of this case and the community knowledge surrounding it required a change of venue. Further, she alleges that the denial of the change in venue denied her right to due process. In specific, Viola alleges that ten (10) of the first forty-four (44) prospective jurors knew of the murder prior to voir dire. ¶32. The decision to grant the venue change is in the sound discretion of the trial judge. *Hoops v. State*, 681 So.2d 521, 526 (Miss. 1996); *Johnson v. State*, 476 So.2d 1195, 1208 (Miss. 1985); *Winters v. State*, 473 So.2d 452, 457 (Miss. 1985); *Cabello v. State*, 471 So.2d 332, 339 (Miss. 1985). "[T]his Court will not disturb the ruling of the lower court where the sound discretion of the trial judge in denying change of venue was not abused." *Harris v. State*, 537 So.2d 1325, 1328 (Miss. 1989); *Burrell v. State*, 613 So.2d 1186, 1190 (Miss. 1993); *White v. State*, 495 So.2d 1346, 1349 (Miss. 1986).

¶33. In *Davis v. State*, 767 So.2d 986, 993 (Miss. 2000), this Court held that "[a] motion for change of venue 'must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public.'" (citing *Hoops*, 681 So.2d at 526).

¶34. The right to a fair trial by an impartial jury is guaranteed by both the federal and state constitutions. *Johnson*, 476 So.2d at 1208 (citing U.S. Constitution Amendment VI and Miss. Const. art. 3, § 26)). "The accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained." *Davis*, 767 So.2d at 993 (citing *White*, 495 So.2d at 1348). "[U]pon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption."

*Johnson*, 476 So.2d at 1211.

¶35. This Court enumerated "certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebutable" *White*, 495 So.2d at 1349. The elements are as follows:

> (1) capital cases based on considerations of a heightened standard of review;
>
> (2) crowds threatening violence toward the accused;
>
> (3) an inordinate amount of media coverage, particularly in cases of
>
> (a) serious crimes against influential families;
>
> (b) serious crimes against public officials;
>
> (c) serial crimes;
>
> (d) crimes committed by a black defendant upon a white victim;
>
> (e) where there is an inexperienced trial counsel.

*Id*.; *Davis*, 767 So.2d at 993-94; *Baldwin v. State*, 732 So.2d 236, 241 (Miss. 1999); *Burrell*, 613 So.2d at 1189-90.

¶36. In the case sub judice, Viola filed a motion for a change of venue accompanied by two affidavits. She claims that the "the sheer weight of the community gossip of [her] case" favored a change of venue. On July 9, 1999, the trial court conducted a hearing for the change of venue motion. The trial court determined that Viola had filed the required affidavits pursuant to Miss. Code Ann.§ 99-15-35 (2000).

¶37. The State then had the burden of rebutting the presumption. *See Johnson*, 476 So.2d at 1211. In support of its position, the State called Sheriff Smith as a witness. Sheriff Smith testified that he traveled throughout the county as part of his duties. He was not aware of any discussion concerning the case and the defendant within the county. The Sheriff heard no one in the county that had a grudge or ill will toward Viola; no threats against Viola; and no prejudgments of the case. Within the last six months, the Sheriff heard no publicity about the case. The State rested, and Viola offered no additional evidence to support her position. The trial judge overruled the change of venue motion with the option to review the ruling upon the completion of voir dire. During the beginning of voir dire, the record reflected that four venire members previously heard of the case. None of these venire members stated that they formed an opinion about the case. As the defense posed venire questions, eight venire persons, including three of the earlier venire members, stated that they had heard of the case. Of these eight venire members, all stated that any knowledge they had of the case would not affect their opinion.

¶38. Given the facts surrounding this issue, we find that Viola did not demonstrate an abuse of discretion in the trial court's denial of the motion for change of venue. Once Viola offered the motion with the two required affidavits, the State had the burden to rebut the presumption. Viola cannot claim that the presumption is irrefutable in accordance with the elements set forth in *White*, 495 So.2d at 1349. This case involved a simple murder not a capital murder case. There was no evidence of threatened violence towards Viola, nor inordinate amounts of media coverage. Sheriff Smith's testimony demonstrated that Viola could receive a fair trial. Upon the conclusion of Sheriff Smith's testimony, Viola offered no additional evidence to

rebut the State's witness and support her motion. As to the venire members who heard about the case prior to trial, all stated that they had not formed an opinion of the case. "The linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Simon v. State*, 688 So.2d 791, 803 (Miss. 1997). Based on the evidence at trial, we find that the trial court did not abuse its discretion in denying the motion for change of venue. Accordingly, this issue is without merit.

## CONCLUSION

¶39. For these reasons, the conviction of Viola Gray by the Covington County Circuit Court for murder and the sentence to serve a term of life in the Mississippi Department of Corrections are affirmed.

¶40. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE, P.J., SMITH, MILLS, WALLER AND DIAZ, JJ. CONCUR. COBB, J., CONCURS IN RESULT ONLY. BANKS, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN THE RESULT:**

¶41. I agree with the result reached by the majority. In my view, however, the trial court erred in excluding the evidence of the sunrise times without first requiring a request for and granting the State a continuance. This is the *Box* procedure which has been repeatedly relied upon by this Court. *See Box v. State,* 437 So.2d 19 (Miss. 1983). *Accord*, *Russell v. State,* 789 So.2d 779 (Miss. 2001); *Ramos v. State,* 710 So.2d 380 (Miss. 1998). Unlike the majority, I see no reason why sunrise times could not have been easily verified or disputed.

¶42. I agree, however, that the error is harmless in the context of this case. The witness was confronted with the reported time and insisted that she could see the perpetrator, who was very familiar to her.

1. Jean, on cross-examination, testified that it was closer to 6:20 a.m. than 6:30 a.m. Jean's 911 call was placed at 6:25 a.m.

2. Jean had testified that she was afraid for her safety initially and did not want to get involved.

3. Jean did not testify that the sun was "high in the sky." The defense tried unsuccessfully to get her to agree with his statement.

4. Rule 4.06, Uniform Criminal Rules of Circuit Court Practice preceded Rule 9.04.