50 P.3d 407

**STATE of Arizona, Appellant/Cross Appellee,**

v.

**Ricardo Dominic MEZA, Appellee/Cross Appellant.**

No. 1 CA–CR 00–0792.

Court of Appeals of Arizona, Division 1, Department B.

July 2, 2002.

As Corrected Aug. 15, 2002.

Review Denied Jan. 7, 2003.*

* Justice Ryan did not participate in the determination of this matter.

Richard M. Romley, Maricopa County Attorney By Richard L. Nothwehr, Deputy County Attorney, Mesa, Attorneys for Appellant/Cross Appellee.

W. Clifford Girard, Jr., Phoenix, Attorney for Appellee/Cross Appellant.

Phoenix Public Defender Contract Office By Gary M. Kula, Executive Director, Phoenix, Amicus Curiae.

## OPINION

FIDEL, Judge.

¶ 1 The State appeals from the trial court's order precluding the use of breath test results in a trial against appellee/cross appellant Ricardo Dominic Meza. The trial court ordered preclusion of that evidence as a sanction against the State for various discov-

ery violations. Meza cross-appeals, claiming that the violations were so egregious that the trial court should have dismissed the charges with prejudice.

## BACKGROUND

### A. The Arrest

¶ 2 On May 16, 1997, Ricardo Meza drove his car into the back of a motorcycle, seriously injuring the motorcyclist. Police officers at the scene noted a moderate to strong smell of alcohol on Meza's breath; his eyes were bloodshot and watery; and, during field sobriety tests, after showing several cues of impairment, Meza announced that he could not continue one of the tests "[b]ecause I'm impaired." Meza was arrested and transported to a nearby DUI van, where Officer Campbell administered two breath tests using Intoxilyzer 5000 unit # 2806. The first test registered an alcohol concentration of .160 percent, the second .159 percent. A grand jury subsequently indicted Meza on one count of aggravated assault involving the use of a dangerous instrument.

### B. Meza's Discovery Effort

¶ 3 Shortly after pleading not guilty, Meza filed a motion for discovery. There followed a long series of motions to supplement discovery, motions to compel discovery, and motions to suppress evidence and dismiss charges for lack of discovery. Among other items, Meza sought all calibration checks and standard quality assurance procedure ("SQAP") tests performed on Intoxilyzer 5000 unit # 2806 during the one-month periods preceding and following his arrest.

¶ 4 During regularly performed calibration checks and SQAP tests, crime lab technicians run sample tests on the machines using a standard solution containing an alcohol concentration of .100. An Intoxilyzer machine functions properly if it assesses a standard .100 solution at between .090 and .110. Intoxilyzer test results are meant to be stored in the Alcohol Data Acquisition Management System ("ADAMS") database and then downloaded into the Arizona Criminal Justice In-

formation System ("ACJIS") for dissemination to prosecutors, defense attorneys, and others. Every calibration check is to be recorded on a paper form known as "Exhibit P," and every SQAP test is to be recorded on a paper form known as "Exhibit Q."

¶ 5 At a hearing on April 27, 1998, Clark McDonough, the criminalist in charge of maintaining the Phoenix Crime Lab's breath testing program, testified that "all calibration checks and function accuracy checks that we perform are put down on forms P and Q" and that "[t]here is no way to perform the tests and not have it on the ADAMS system." He also testified that, to his knowledge, there was no way to delete such tests from the memory, a statement he reiterated several months later. Indeed, to underscore the point at the first hearing, the prosecutor asked, "And you, personally, as a person who does those calibration tests, you don't intentionally try to delete any information, do you?" McDonough answered, "No. No, I do not." [1]

¶ 6 In a subsequent motion to clarify discovery issues, the State asserted that it had "either supplied the requested information or the information is irrelevant and the Defense is on a fishing expedition or no such information exists." Rejecting that assertion, the trial court "determin[ed] that the discovery request by the Defense [was] valid," granted the motion to compel, and, with several specified exceptions, ordered production by June 15, 1998.

¶ 7 Meza, dissatisfied with the disclosure that followed, filed motions for supplemental discovery in July 1998, including a request for all ADAMS records from unit # 2806 from January 1, 1997, until the date of the request. The State responded that it had "either supplied the requested information or no such documents exist[ ]." After a series of further motions to compel, motions for sanctions, and motions to dismiss, the trial court observed at a hearing on December 21, 1998, that the Crime Lab's approach to its disclosure obligations had been "flat unacceptable"

1. As we subsequently discuss, records discovered by a defense expert in 2000, after Meza's first trial ended in a mistrial, showed that five calibra-

tion checks performed on March 9, 1998, 49 days before McDonough's testimony, were "[d]eleted by clark mcdonough." *See infra* ¶ 28.

and that the court was "not going to tolerate any more." Ordering the State to produce all ADAMS retrieval records by noon on December 24, the court added, "In the event ... that all records are not produced for the subject machine during the subject time period, this Court will dismiss this matter and the only issue will be whether this dismissal will be with or without prejudice."

¶ 8 As trial approached, the Phoenix Crime Lab's account of its record-keeping practices began to change. McDonough had testified in April 1998 that all tests on the machines were recorded and that there was no way to delete such tests from memory. But Mc-Donough left the Crime Lab; and at an evidentiary hearing on May 5, 1999, one month before trial, Jesse Shriki, McDonough's replacement, testified that by employing a certain code, a criminalist testing a machine could prevent the test from being recorded in the ADAMS memory, and that he had done so himself in past instances of "experimental testing." No written policy established this procedure. Nor, as the evidence soon showed, were such anticipatory deletions limited to experimental testing.

¶ 9 Shortly after that hearing, Meza's counsel received a copy of a memo in which Terry Hogan, a Department of Public Safetyemployee, asked a colleague whether he should "delete" a calibration check. The Yavapai County Attorney's Office had disclosed the memo to an attorney in Sedona in an unrelated case, who then passed it on to Meza's counsel. On the basis of this new evidence suggesting that calibration checks could be deleted, Meza filed a motion to preclude introduction of his breath test results at trial. At a hearing on the motion, Shriki testified that a quality assurance specialist performing a calibration check could prevent the results of that check from entering ACJIS if, in the opinion of that specialist, "they do not reflect the operating condition of the instrument." The purpose of this practice, he stated, was to prevent test results perceived as invalid from becoming accessible to defense experts and from being inappropriately used to discredit the machines and their results. Shriki told the court, however, that there should be ADAMS records for all calibration checks run on a particular machine, whether or not the results of those checks were downloaded into ACJIS.

¶ 10 At the conclusion of the hearing, the court denied Meza's motion to preclude the breath test. An essential basis for the court's decision was that, according to the ADAMS data on unit # 2806, "[t]here were no failed calibration tests ·in the period between May 14th and May 29th." Although, according to the court, there might have been prejudice if evidence of failed calibration tests had been withheld, here "all calibration tests indicated that the instrument was working properly. All experts have said, assuming that the instrument was working properly on May 14th, assuming that it was working properly on May 29th and May 30th, both of which were before and after the subject test, a ... reasonable scientific assumption, is that the machine was working properly on the date in question." It followed, the court concluded, that Meza could not show prejudice from the lack of disclosure.

### C. The Trial

¶ 11 The next week, Meza was tried. The two-year delay in reaching trial after his arrest was largely a function of the State's delay in providing discovery. The evidence included testimony regarding the calibration checks and SQAP tests conducted during the period before and after Meza's arrest. Each test showed that the machine functioned properly within the approved .090 to .110 range. In particular, while testing a solution with an alcohol concentration of .100 on May 29, 1997, purportedly the first test after Meza's breath samples were taken, the machine registered an alcohol concentration of .094.

¶ 12 The jury deadlocked. The court declared a mistrial and scheduled a new trial to begin approximately one month later. Subsequently, the court continued the case several times pending the outcome of other ADAMS-related cases.

### D. Post-Trial

¶ 13 In preparing for his second trial, Meza renewed his claim that the State had with-

held evidence regarding the breath tests. In response, the State continued to maintain that no evidence had been withheld, declaring, "One final critical fact needs to be addressed at this point: All relevant information regarding the breath testing instrument involved in Defendant's case has been disclosed."

¶ 14 The State was mistaken. Fortuitously, while reviewing the entire ADAMS database in connection with other ADAMS-related litigation, Meza's expert witness noticed that a May 29, 1997, entry for unit # 2806 had been deleted. The entry was contained in a file labeled "BFMLOGG."

¶ 15 The BFMLOGG was a data field in ADAMS within which data changes in other ADAMS logs were stored. Not only did it contain a record of each time that someone signed onto the ADAMS system and downloaded, modified, or deleted information; it also, like a "computer garbage can," contained the deleted information, including deletions from the calibration file. Because the BFMLOGG was separate from the calibration file, when the Crime Lab printed out and disclosed records of calibration checks and other tests performed on Intoxilyzer units such as unit # 2806, records in the BFMLOGG were not included. Thus, when Shriki testified on June 1, 1999, that records of tests prevented from entering ACJIS were still on the ADAMS system, he was technically, but misleadingly correct: the results remained on the ADAMS database only in an inaccessible and undisclosed repository of deletions that, according to Shriki's subsequent testimony, was unknown even to Shriki himself.[2]

¶ 16 The BFMLOGG entry found by Meza's expert revealed that in an undisclosed calibration check performed on unit # 2806 on May 29, 1997, the machine had registered .087, below the range considered accurate. This test had been conducted immediately before the successful test that the State had relied upon to establish the machine's accuracy at trial. It was, in other words, the first calibration check performed on unit # 2806

after Meza's arrest. And it had been performed—and immediately thereafter deleted—by none other than Jesse Shriki, the State's expert who testified at trial regarding the successful May 29, 1997, test. The State admits that it did not disclose this failed calibration test before Meza's trial.

¶ 17 Meza's counsel notified the trial court of the newly discovered calibration check and filed a motion to dismiss or, in the alternative, to suppress the breath test results. At a hearing on the motion, Shriki acknowledged that he had not previously revealed his own deletions from the ADAMS system, stated that he had no independent recollection of the deleted test on May 29, 1997, and testified that he was unaware, both in 1997 and at the time of his testimony in 1999, that there existed a BFMLOGG or that deletions were saved or could be retrieved. After concluding the hearing, the trial court denied Meza's motion to dismiss but granted the motion to suppress. The court stated:

> This Court does not find that a dismissal of the charges is warranted. There is no evidence that the State intentionally failed to disclose this evidence.... While the Court has not found intentional misconduct, the State had been guilty of gross negligence in failing to produce this evidence. It failed to produce this evidence despite numerous court orders, and previous extensions of deadlines to produce evidence of all calibration tests.

## JURISDICTION

■■■ ¶ 18 The State appeals the trial court's order of suppression;[3] Meza cross-appeals, arguing that the court should have granted his motion to dismiss. The trial court's order of suppression is appealable. See A.R.S. § 13–4032(6) (2001). The denial of Meza's motion to dismiss is not. See A.R.S. § 13–4033 (2001) (limiting actions from which a defendant may appeal); State v. Whitney, 108 Ariz. 277, 277–78, 496 P.2d 138, 138–39 (1972) ("[The right of appeal] is purely statutory and does not exist in absence of statute."). The proper vehicle to

---

2. See infra ¶ 17.

3. The State was permitted to dismiss the prosecution without prejudice in order to initiate this appeal.

challenge the denial of a motion to dismiss is not an appeal but a petition for special action. *See Nelson v. Roylston,* 137 Ariz. 272, 273, 669 P.2d 1349, 1350 (App.1983). However, "where relief may be granted by extraordinary writ (special action), [an appellate court] may grant the appropriate relief even though the writ applied for ... is not aptly titled." *Brown v. State,* 117 Ariz. 476, 477, 573 P.2d 876, 877 (1978); *see also Bustamonte v. Ryan,* 175 Ariz. 327, 328, 856 P.2d 1205, 1206 (App.1993). Because both the appeal and cross appeal have been fully briefed, concern the same cluster of events, and present the common question of the proper sanction warranted by the State's conduct, we will treat Meza's cross appeal as a petition for special action, accept jurisdiction, and consider it along with the State's appeal.

### IS A SANCTION WARRANTED?

¶ 19 The trial court has great discretion in deciding whether to sanction a party and how severe a sanction to impose. *State v. Delgado,* 174 Ariz. 252, 256, 848 P.2d 337, 341 (App.1993). We review such a decision for an abuse of discretion and grant considerable deference to the trial court's perspective and judgment. *State v. Fisher,* 141 Ariz. 227, 246, 686 P.2d 750, 769 (1984).

¶ 20 Even if the defense had not requested and the court had not ordered disclosure of the ADAMS records at issue, the State's failure to disclose them would have violated the discovery rules. *See* Ariz. R.Crim. P. 15.1(a)(7) (1993) [4] (requiring the prosecution to disclose to the defense "[a]ll material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce the defendant's punishment therefor"). The disclosure requirements of Rule 15.1 are grounded in the due process clauses of the state and federal constitutions. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment....").

¶ 21 The State must disclose not only "information in the possession or control of members of the prosecutor's staff," but also that within the possession or control "of any other persons who have participated in the investigation or evaluation of the case." Ariz. R.Crim. P. 15.1(d) (1993).[5] Thus, although the requested information was in the control of the Phoenix Police Department Crime Lab rather than the prosecutor's office, "a law enforcement agency investigating a criminal action operates as an arm of the prosecutor for purposes of obtaining information that falls within the required disclosure provisions of Rule 15.1." *Carpenter v. Superior Court,* 176 Ariz. 486, 490, 862 P.2d 246, 250 (App. 1993); *see also In re Brown,* 17 Cal.4th 873, 72 Cal.Rptr.2d 698, 952 P.2d 715, 718–19 (1998) (recognizing a crime lab as part of the prosecution team and that "any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution").

¶ 22 Rule 15.7 of the Arizona Rules of Criminal Procedure allows a court to sanction a party that fails to comply with discovery rules or any orders related to the discovery process. In opting for suppression as a sanction, the trial court did not find intentional conduct but did find that the State had been "guilty of gross negligence." The court also made clear that it absolved the prosecu-

---

4. Rule 15 was amended on May 31, 2002, by Arizona Supreme Court Order No. R–00–0003. In the amended rule, which will become effective on December 1, 2002, the quoted portion of former subpart 15.1(a)(7) appears in subpart 15.1(a)(8).

5. In the amended version of Rule 15, the former subpart 15.1(d) becomes subpart 15.1(g) and is revised as follows:

Scope of Discovery. The prosecutor's obligation under this rule extends to material and information in the possession or control of any of the following:

(1) The prosecutor, or the prosecutor's staff, or

(2) Any law enforcement agency which has participated in the investigation of the case and which is under the prosecutor's direction or control, or

(3) Any other person who has participated in the investigation of the case and who is under the prosecutor's direction or control.

Ariz. R.Crim. P. 15.1(g) (2002).

tion, as distinguished from the Crime Lab, of bad faith:

> I am absolutely satisfied that [the prosecutor] has made reasonable good faith efforts to comply with all the Court's efforts and orders. And I am also convinced beyond any shadow of a doubt that any representations you made to [defense counsel] were either because of information that was given to you by the crime lab or, perhaps, a faulty assumption on your behalf. . . .
>
> But I don't attribute anything I have heard so far to any bad faith on your part, and you need not defend yourself. You may want to spend some time here this morning defending the crime lab . . . .

¶ 23 We defer to the trial court's conclusion that the prosecutor neither knew of the deleted calibration checks nor knew of the Crime Lab policies that encompassed those deletions and that any fault on the part of the prosecution resulted from negligent rather than willful conduct. We cast a more skeptical eye on the behavior of the Phoenix Crime Lab.

¶ 24 The Crime Lab, we now know, had instituted an unwritten policy not to record failed calibration checks if, in the opinion of a quality assurance specialist, those checks did not represent the true operating condition of the machine. When asked the authority for this practice, Shriki testified, "There was no overt statement saying, 'You have the authority to do this.' This was a policy that we had; that it was up to the discretion of the quality assurance specialist to report those tests to ACJIS or to DPS." [6]

¶ 25 Shriki was certainly correct that overt authority was lacking for the Crime Lab's practice. The Department of Health Services ("DHS") has the statutory responsibility to enact rules governing the administration of breath tests, including "[p]rocedures for ensuring the accuracy of results obtained from approved breath testing devices." A.R.S. § 28–1324(2) (1998). To meet this responsibility, DHS adopted regulation R9–14–404, which requires law enforcement agencies and others who administer breath

testing to establish "a quality assurance program conducted by a quality assurance specialist." The regulation and its accompanying exhibits specify, among other things, the requirements for the performance and recording of calibration tests of breath testing devices. And nowhere in the regulation or in the exhibits is a quality assurance specialist given discretion to withhold the recording of a calibration test.

¶ 26 To the contrary, an essential purpose of the regulatory scheme and the ADAMS/ACJIS recording system is to preserve, and permit examination of, the data that will permit independent verification of the accuracy of breath-testing devices. By requiring transparency of testing and comprehensiveness of data, Arizona seeks to instill confidence in the accuracy of those devices, not only among participants in the criminal justice system, but among the general public as well.

¶ 27 This purpose has been thwarted, and confidence undermined, by the deletion practices that the trial court confronted in this case. And even if we assume that the Crime Lab's practices were well-intended and that the objective was only to delete tests that participating Crime Lab employees honestly believed were unreliable and might unnecessarily impugn the accuracy of the machines, this was not a judgment that was theirs to make. At bottom, they engaged in the secretion or attempted destruction of inconvenient evidence—evidence that should have been available for independent evaluation by prosecutors, criminal defendants, and the courts.

¶ 28 Worse than this, however, Crime Lab employees gave affirmatively misleading testimony before the court. As we have indicated, McDonough testified on April 27, 1998, that "all calibration checks and function accuracy checks that we perform are put down on forms P and Q." Shriki reiterated that claim shortly before trial but moments later admitted that P forms were not used for tests kept from entering ACJIS. And in April 1998,

---

6. According to the evidence, the Department of Public Safety ("DPS") participated in the development of this policy and practice. It suffices in this case, however, to focus on the acts and omissions of the Phoenix Crime Lab.

McDonough repeatedly testified that it was not possible to delete tests from ADAMS. Yet when the BFMLOGG file was discovered after trial, within it were records of five failed calibration checks from March 9, 1998, *conducted and deleted by McDonough himself.*

¶ 29 "Gross negligence" does not, in our judgment, accurately summarize the Crime Lab's actions. Instituting an unwritten, rogue practice of deleting evidence of failed calibration checks; withholding evidence from the prosecution, the defendant, and the court; misleading the court in testimony under oath—these acts amounted at a minimum to willful nondisclosure and richly warranted a sanction under Rule 15.7.

### DID THE TRIAL COURT CHOOSE AN APPROPRIATE SANCTION?

¶ 30 As a sanction for the Crime Lab's behavior, the trial court ordered suppression of Meza's breath test results. Although the State acknowledges that some sanction was appropriate, it argues that the trial court's chosen sanction was too harsh. Meza responds that the trial court's sanction was insufficient and that any sanction short of dismissal with prejudice was an abuse of the court's discretion.

¶ 31 The presently applicable version of Rule 15.7 provides that sanctions for discovery abuses shall be "just under the circumstances," and may include, but are not limited to:

(1) Ordering disclosure of the information not previously disclosed.

(2) Granting a continuance.

(3) Holding a witness, party, or counsel in contempt.

(4) Precluding a party from calling a witness, offering evidence, or raising a defense not disclosed; and

(5) Declaring a mistrial when necessary to present a miscarriage of justice.

Ariz. R.Crim. P. 15.7 (1993).[7]

¶ 32 Before suppressing evidence as a discovery sanction, a court should consider, among other relevant factors, the vitality of the evidence to the proponent's case; the degree to which the evidence or the sanctionable conduct has been prejudicial to the opposing party; whether the sanctionable conduct was willful or motivated by bad faith; and whether a less stringent sanction would suffice. *See State v. Smith,* 140 Ariz. 355, 359, 681 P.2d 1374, 1378 (1984). The State argues that, because Meza now has the evidence regarding the failed calibration check with ample time to review it before his second trial, he has not suffered any prejudice; in contrast, the State continues, the breath test evidence is so vital to the State that the trial court abused its discretion by failing to choose a lesser sanction than suppression.

¶ 33 We disagree. To begin with, three of the sanctions listed in Rule 15.7—a disclosure order, a continuance, and a mistrial—are plainly inadequate in a case where multiple disclosure orders were violated, multiple continuances resulted, and the information

---

7. Amended Rule 15.7(b) provides as follows:

If a court finds that a party has failed to comply with any provisions of this rule or an order issued pursuant to it, the court shall order the disclosure of the information not previously disclosed. The court shall in addition impose any sanction it finds appropriate, unless the court finds that the failure to comply was harmless or that the information could not have been discovered and disclosed earlier even with due diligence and the information was disclosed immediately upon its discovery. All orders imposing sanctions shall take into account the significance of the information not timely disclosed, the impact of the sanction on the party and the victim and the stage of the proceedings at which the disclosure is ultimately made. If disclosure is made within five days of trial or during trial, the sanction or sanctions imposed shall ordinarily include at least one of the sanctions listed in subparagraphs (1) or (2) of this paragraph. Available sanctions include, but are not limited to:

(1) Precluding or limiting the calling of a witness, use of evidence or argument in support of or in opposition to a charge or defense.

(2) Dismissing the case with or without prejudice.

(3) Granting a continuance or declaring a mistrial when necessary in the interests of justice.

(4) Holding a witness, party, person acting under the direction or control of a party, or counsel in contempt.

(5) Imposing the costs of continuing the proceedings, or

(6) Any other appropriate sanction.

Ariz. R.Crim. P. 15.7(b) (2002).

fully emerged only after a mistrial had already occurred. As for contempt, the prosecutors, unaware of the Crime Lab's practices, acted in good faith; McDonough and Shriki, who misled the court about those practices, are no longer in the Crime Lab's employ.

¶ 34 Second, the State is mistaken in asserting that Meza has suffered no prejudice. Though he at last attained the evidence in question before his second trial could be convened, he attained it only after some 30 discovery motions by his counsel and protracted delay of his day in court.[8] Moreover, although a retrial is not barred by double jeopardy considerations,[9] Meza suffered a form of prejudice when the State placed his liberty in jeopardy in the first trial without providing him court-ordered discovery that was significant to his defense. Indeed, the trial court, which was in the best position to evaluate the matter, commented in suppressing the breath test results, "Had the trial jury known of [the] failed calibration test in June [1999,] it might well have acquitted the Defendant at that time."

¶ 35 Third, we think the claim exaggerated that breath test evidence is vital to the State. Such evidence is surely useful and important, but it is not the only evidence of intoxication that is available in this case. *See supra* ¶ 2.

¶ 36 Fourth, we find, again with deference to the trial court, a particular aptness to the sanction that it chose. The Crime Lab made a sustained and willful effort to insulate breath test evidence from the challenge that would arise from the discovery of failed calibration tests. That effort included deceptive testimony in this case. A fitting response is suppression of the evidence that the Crime Lab improperly sought to protect from scrutiny.

¶ 37 The trial court concluded that no less a sanction than suppression would fit the circumstances of the case. Just as we defer to that conclusion, we likewise defer to the trial court's conclusion that the ultimate sanction of dismissal with prejudice is not required. Given the egregious course of conduct that we have described, however, we do so only because of an intermediate additional sanction that remains open to the court. Before a court imposes a sanction that restricts the evidence at trial or affects the merits of the case, the court must inquire whether a less stringent sanction would suffice. *See State v. Smith*, 140 Ariz. at 358–59, 681 P.2d at 1377–78; *see also Nesmith v. Superior Court*, 164 Ariz. 70, 72, 790 P.2d 768, 770 (App.1990) (it is error not to "thoroughly consider[ ] other, less severe, sanctions before resorting to the most extreme"). Mindful that the presently applicable version of Rule 15.7 permits any sanction that the court finds "just under the circumstances" (revised in the 2002 amended version of 15.7(b)(6) to "any ... appropriate sanction"), we conclude that, if the State retains the capacity to retry this matter, justice requires a supplemental, restitutionary monetary sanction to alleviate the cost of the extraordinary discovery burden that the State has forced the defense to undergo.[10]

¶ 38 When the trial court entered its order of suppression, it acknowledged the diligence, tenacity, and fine work of Meza's lawyer; but such work is not accomplished without time and cost. And in this case it is apparent that

8. Meza's first trial did not occur until approximately two years after his arrest. After that trial, a year and a half passed in further discovery proceedings while the BFMLOGG was discovered and its implications were explored. It is now approximately five years from Meza's arrest, and he is still awaiting his second trial. Most of this delay is attributable to the State's disclosure failures.

9. *See State v. Jorgenson*, 198 Ariz. 390, 391, ¶ 4, 10 P.3d 1177, 1178 (2000) ("The grant of a mistrial does not bar retrial except when the mistrial is granted because of intentional prosecutorial misconduct aimed at preventing an acquittal.").

10. Our colleague, in dissenting from this portion of our opinion, writes that in addressing a sanction not discussed by the parties, we are "acting as a roving commission of justice." *See infra* ¶ 46. We think rather that we are meeting our obligation to examine whether a less stringent sanction is available to the court before resorting to the ultimate sanction of dismissal with prejudice. If we were convinced, as our colleague maintains, that an assessment of fees and costs were beyond the court's authority under Rule 15, we would be less disposed to reject dismissal with prejudice as the sanction warranted in this case.

hundreds of hours of time, with commensurate costs, were wrongfully thrust upon Meza and his counsel by the State.

¶ 39 Idaho Criminal Rule 16, like Arizona's Rule 15.7, enumerates certain means by which criminal courts may respond to discovery violations and then adds, in language similar to Rule 15.7, the omnibus power to enter "such other order as [the court] deems just under the circumstances." *State v. Stradley*, 127 Idaho 203, 899 P.2d 416, 419 n. 1 (1995). The Idaho Supreme Court, interpreting that broad language, has held that it includes the power to enter a restitutionary monetary sanction to cover the fees and costs arising from discovery violations. *Id.* at 423–24 (upholding restitutionary award against defense counsel); *State v. Thompson*, 119 Idaho 67, 803 P.2d 973, 975–76 (1990) (upholding restitutionary award against State in the amount of additional fees resulting from discovery violation). We similarly interpret Rule 15.7.

¶ 40 The Idaho Supreme Court supported its holding in part by reference to I.C.R. 2(a), which states that the Idaho Criminal Rules "are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and elimination of unjustifiable expense and delay." *Stradley*, 899 P.2d at 424. In almost identical language, Rule 1.2 of the Arizona Rules of Criminal Procedure states, "These rules are intended to provide for the just, speedy determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration, the elimination of unnecessary delay and expense, and to protect the fundamental rights of the individual while preserving the public welfare." In our opinion, our construction of Rule 15.7 to permit a restitutionary monetary sanction supports each of these objectives and especially the elimination of unnecessary delay and expense.

¶ 41 We have recognized that the Maricopa County Attorney's Office, as the trial court found and defense counsel acknowledged, made a good faith effort to meet its discovery obligations in this case. Yet, as we have also recognized, a law enforcement agency participating in a criminal investigation operates as an arm of the prosecutor in matters of discovery. *See supra* ¶ 21; *see also Thompson*, 803 P.2d at 976 (recognizing that missing data were located in a laboratory "within the constructive control of the State"). When such an agency is recalcitrant, withholds discovery, and misrepresents the existence and availability of information subject to discovery, its conduct, in our view, is *the State's* conduct, and imposes a restitutionary burden on the State.

¶ 42 The Supreme Court of Mississippi reached a similar conclusion in *State v. Blenden*, 748 So.2d 77 (Miss.2000). There, as here, discovery violations by a crime lab necessitated a mistrial in a DUI prosecution and resulted in a substantial increase in attorney fees for the defense. *Id.* at 81, ¶ 10, 82, ¶ 14. Upholding a restitutionary monetary sanction, the court stated,

> Where material evidence within the knowledge of a governmental officer has been withheld from the defense, that knowledge is imputed to the prosecutor, regardless of the fact that the governmental officer with actual knowledge is from a different governmental agency.... Such knowledge is also imputable to the prosecution regardless of the good or bad faith of the prosecutor.

*Id.* at 86, ¶ 30 (citation omitted).

¶ 43 We do not suggest that the State is a monolithic entity; nor do we foreclose the possibility that upon remand the trial court may, with appropriate notice and a hearing, consider where, among the public agencies that participated in the prosecution of this matter, a restitutionary sanction can most properly be assigned. The State, however, wrongfully made Meza bear substantial and unnecessary discovery fees and costs, and the State must make him whole.

## CONCLUSION

¶ 44 For the foregoing reasons, we affirm the trial court's order of suppression, grant no relief from the trial court's denial of Meza's motion to dismiss with prejudice, and remand with instructions to the trial court to assess, as an additional discovery sanction,

the reasonable costs and fees that the defense has incurred as a consequence of the sanctionable conduct of the State.

CONCURRING: JOHN C. GEMMILL, Presiding Judge.

HALL, Judge, concurring in part and dissenting in part.

¶ 45 The only issues the parties asked us to decide were the State's claim that the trial court erred by precluding the State from further use of the breath test results and Meza's claim that the appropriate remedy was dismissal with prejudice. Considering the actions of, and misleading testimony by, employees of the Phoenix Crime Lab as described in the majority opinion, I agree with my colleagues that the trial court did not abuse its discretion by imposing the sanction of preclusion. *See* Rule 15.7(a)(4). That should have been the end of the case.

¶ 46 Instead, the majority, acting as a roving commission of justice and despite the lack of any briefing on the issue, *see Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 203 n. 14, 16 P.3d 757, 764 (2001) ("court[s] traditionally do[ ] not address issues not presented by the parties"), have decided on their own motion "to alleviate the cost of the extraordinary discovery burden that the State has forced the defense to undergo." *Ante* at ¶ 37. To do so, my colleagues interpret Rule 15.7(a) as authorizing a sweeping attorneys' fees and costs sanction against a party, the Maricopa County Attorney ("MCA"), that neither engaged in abusive discovery practices nor acted in bad faith.[11] I disagree with both the majority's transmutation of Rule 15.7(a) into a general monetary compensation rule and their determination that the MCA is strictly liable to Meza for attorneys' fees and other expenses incurred.

¶ 47 The majority engage in a two-step process to reach their conclusion that the MCA is liable for Meza's expenses. First, relying on Idaho cases construing similar language in Idaho Criminal Rule 16(j), they interpret the phrase in Rule 15.7(a) that allows the court to "impose any sanction which it finds just under the circumstances" as authorizing the imposition of what the majority euphemistically term "a restitutionary monetary sanction[.]" *Ante* at ¶ 40. Second, to justify the mandatory imposition of attorneys' fees[12] against a party whose good-faith discharge of its disclosure obligations is unquestioned, the majority claim that the conduct of the Phoenix Crime Lab is nonetheless imputed to the MCA. Because I disagree with both the majority's transmutation of Rule 15.7(a) into a broad compensatory rule and their application of it in this instance to impute liability to the MCA for Meza's attorneys' fees and other expenses, I respectfully dissent from that portion of the majority's opinion.

**I.**

¶ 48 The majority's reliance on the Idaho Supreme Court's interpretation of Idaho Criminal Rule 16(j) is misplaced. The drafters of Rule 15[13] relied greatly on the ABA Standards Relating to Discovery and Procedure Before Trial (Approved Draft, 1970)[14] and on the then-proposed Federal Rule of Criminal Procedure 16(d)(2) ("Federal Rule 16(d)(2)"). *See* Rule 15 cmts. Section 4.7 of

---

**11.** Defense counsel, while arguing Meza's first motion to dismiss on December 21, 1998, described the prosecutor's conduct:

> I believe she did not know what was going on here, and in good faith efforts I think she was running around trying to get those logs and produce it for me, I have been in touch with [the prosecutor]. I consider her ethics very high, the highest, and her capabilities are the highest. She, too, must have the information presented to her the same as I do.

**12.** Although it is clear that the majority do not intend that Meza's restitution be limited to attorneys' fees, in the interest of brevity, I focus my

dissent on that issue. For analogous reasons, however, I also believe Rule 15.7(a) does not authorize other "restitutionary" sanctions such as court costs and expert witness fees, except to the extent that they may be imposed as contempt sanctions under Rule 15.7(a)(3). *See infra* at ¶¶ 49–52.

**13.** The supreme court adopted Rule 15 effective September 1, 1973, as part of a comprehensive revision of Arizona's criminal rules of procedure.

**14.** *See also* ABA Standards for Criminal Justice, § 11–4.7 (2d ed.1984); ABA Standards for Criminal Justice Discovery and Trial by Jury, § 11–7.1 (3d ed.1995).

the 1970 ABA Standards and Federal Rule 16(d)(2) contain phraseology identical to Idaho Criminal Rule 16(j) authorizing the court to "enter such other order as it deems just under the circumstances." However, neither the commentaries to the ABA Standards nor cases discussing the authority of federal courts to assess attorneys' fees support the expansive interpretation that the majority give the analogous phrase in Rule 15.7(a).

¶ 49 A fair reading of the commentaries to the 1970, 1984, and 1995 ABA Standards shows that the intent of the general authority to enter a "just" order was to allow a trial court "to tailor a remedy to fit the circumstances," 1984 ABA Standards, § 11–4.7(a) commentary, but that an award of attorneys' fees was not one of the intended remedies:

> [T]he court also has general authority to enter an order, not specified in the standard, imposing appropriate remedies for a discovery violation. Such orders may include, for example, postponing the opposing party's duty to make its corresponding discovery disclosures, or postponing cross-examination of a witness who was not disclosed in advance of trial.

1995 ABA Standards, § 11–7.1(a) commentary (footnotes omitted).

¶ 50 Instead, since their inception, the Standards, as has Rule 15.7(a), have contained a specific provision authorizing the court to exercise its contempt powers as necessary to secure compliance with discovery rules. *Compare* 1995 Standards, § 11–7.1(b) ("The court may subject counsel to appropriate sanctions, including a finding of contempt, upon a finding that counsel willfully violated a discovery rule or order.") *and*

Rule 15.7(a)(3) (court may "[h]old[ ] a witness, party, or counsel in contempt" for failure to comply with Rule 15) [15] *with* Idaho Criminal Rule 16 (no contempt provision). The majority, by imposing attorneys' fees through a broad interpretation of Rule 15.7(a)'s general grant of authority, skirts the more stringent requirements of the contempt remedy authorized by Rule 15.7(a)(3).[16]

¶ 51 Neither can the majority's holding be explained as an exercise of its inherent authority apart from Rule 15.7. In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257–58, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the United States Supreme Court affirmed the continuing vitality of the "American Rule" that requires each party to bear the cost of its own attorneys' fees absent express statutory authority except in the following exceptional circumstances: (1) the common fund doctrine applies; (2) a party willfully disobeys a court order; or (3) a party acts in bad faith. *See also Zambrano v. City of Tustin*, 885 F.2d 1473, 1482 (9th Cir.1989) (holding that absent "explicit Congressional authorization, the factual prerequisites of bad faith misconduct or willful disobedience laid out in *Alyeska* must be met") (footnote omitted).

¶ 52 Similarly, in Arizona, which follows the American Rule, attorneys' fees are generally not recoverable absent authorization by statute, contract, or court rule. *Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314, 316, 714 P.2d 807, 809 (1986); *Schwab Sales, Inc. v. GN Constr. Co.*, 196 Ariz. 33, 35, ¶ 4, 992 P.2d 1128, 1130 (App.1998). There are numerous statutes and court rules in Arizona that contain express provisions either autho-

---

**15.** Compare also the amendment to Rule 15.7(a)(3) which broadens the court's authority by allowing it to hold in contempt a "person acting under the direction or control of a party." Order Amending Rule 15, Rules of Criminal Procedure, Supreme Court No. R–00–0003 at 12 (May 31, 2002) (renumbered as 15.7(b)(4)) (effective Dec. 31, 2002).

**16.** A court may assess attorneys' fees as part of a fine levied for criminal contempt. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Criminal contempt however, requires a finding of willful disobedience by the offending party. *See, e.g., Riley v. Superior Court*, 124 Ariz. 498,

499, 605 P.2d 900, 901 (App.1980). The majority's reliance on Rule 15.7's general authority enables my colleagues to avoid discussing whether Rule 15.7(a)(3)'s contempt sanction authorizes a remedial award of attorneys' fees for civil contempt. *Compare Perry v. O'Donnell*, 759 F.2d 702, 704 (9th Cir.1985) (express finding of wilfulness not required for award of attorneys' fees in civil contempt actions) *with Wright v. Jackson*, 522 F.2d 955, 958 (4th Cir.1975) (refusal to comply with a court order must rise to the level of obstinacy, obduracy, or recalcitrance before *Alyeska's* "willful disobedience" exception may be invoked).

rizing or requiring the assessment of attorneys' fees,[17] but I believe this is the first case in Arizona in which an appellate court, using a general grant of authority to make "just" orders, has imposed attorneys' fees based on a theory of imputed liability.[18] *Cf. Alyeska,* 421 U.S. at 260, 95 S.Ct. 1612 (Congress has not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted."). More importantly, the rationale for holding the prosecutor accountable under Rule 15.7 for a law enforcement agency's failure to disclose potentially exculpatory information does not support imputing liability for Meza's attorneys' fees.

## II.

¶ 53 The majority's remand order is not conditioned on a finding by the trial court that the MCA willfully disobeyed the trial court's orders or attempted in bad faith to avoid complying with Rule 15. Instead, my colleagues obviate the necessity of such a finding by treating the MCA and the Phoenix Crime Lab as a monolithic entity, despite their claim to the contrary. *Ante* at ¶ 43. They justify this linkage on the theory that a prosecutor is accountable for any misconduct by a law enforcement agency involved in the investigation.

¶ 54 The legal linchpin of the majority's decision to hold the MCA strictly liable for the Phoenix Crime Lab's sins and omissions is Rule 15.1(a)(7), which requires a prosecutor to make available to a defendant "[a]ll material or information which tends to mitigate or negate the defendant's guilt" that was "within the prosecutor's possession or control." I do not dispute that the Phoenix

Crime Lab was under the MCA's control for purposes of its general compliance with Rule 15.1. *Carpenter v. Superior Court,* 176 Ariz. 486, 490, 862 P.2d 246, 250 (App.1993) (holding that state law enforcement agencies fall under prosecutor's control for purposes of Rule 15.1 disclosure); Rule 15.1(d) ("The prosecutor's obligation under this rule extends to material and information in the possession or control of members of the prosecutor's staff *and of any other persons who have participated in the investigation or evaluation of the case and who are under the prosecutor's control.*") (emphasis added). Therefore, although the MCA discharged its disclosure obligations in good faith, the trial court's order precluding the State from use of the breath test results was an exercise of its authority explicitly authorized by Rule 15.7(a).

¶ 55 It makes good sense to hold prosecutors responsible for ensuring that relevant information in the possession of law enforcement agencies is disclosed by imposing the sanction of preclusion for non-disclosure of evidence. Preclusion is justified as a tool to encourage prosecutors to develop policies to ensure the flow of discoverable information to their offices from local law enforcement agencies. *See Carpenter,* 176 Ariz. at 489, 862 P.2d at 249.

¶ 56 It is quite another thing, however, to assess attorneys' fees against a prosecutor who makes a diligent, good-faith effort to comply with Rule 15.1 but is frustrated in his or her efforts by the conduct of a law enforcement agency not directly answerable to the prosecutor. Under such circumstances, the search for truth—the ultimate goal of Rule 15's reciprocal disclosure requirements—is not advanced by awarding attor-

---

17. *See, e.g.,* A.R.S. §§ 12–341.01(A) (1992) ("any contested action arising out of a contract"); – 348(A)(1) (2000) ("[a] civil action brought by the state or a city, town or county against the [prevailing] party"); –349(A) (1992) (a civil action where an attorney or party: (1) "[b]rings or defends a claim without substantial justification," (2) "[b]rings or defends a claim solely or primarily for delay or harassment," (3) "[u]nreasonably expands or delays the proceeding," or (4) "[e]ngages in abuse of discovery"); Ariz. R. Civ. P. 11 ("a pleading, motion or other paper [ ] signed in violation of this rule"); and Ariz. R. Civ. P. 37(c)(1) ("disclosure [made] pursuant to

Rule 26.1 that the party or attorney knew or should have known was inaccurate or incomplete and thereby causes an opposing party to engage in investigation or discovery").

18. Arizona has judicially created several equitable exceptions to the American Rule against fee-shifting, none of which apply here. *See, e.g., Arnold v. Ariz. Dep't of Health Servs.,* 160 Ariz. 593, 609, 775 P.2d 521, 537 (1989) (private attorney general doctrine); *Steinfeld v. Zeckendorf,* 15 Ariz. 335, 341, 138 P. 1044, 1045–47 (1914) (common fund doctrine).

neys' fees against the prosecutor. My colleagues blithely assert that today's decision will simplify disclosure and eliminate unnecessary delay and expense. *Ante* at ¶ 40. I, on the other hand, fear that the majority's unprecedented construction of Rule 15.7 will have just the opposite effect, and will result in interminable delays as parties aggressively wield Rule 15.7 as a weapon to recoup litigation expenses instead of using it as a shield of last resort after the parties have been unable to informally resolve any discovery disputes between themselves.

¶ 57 For the reasons expressed above, I would simply affirm the trial court's order of preclusion and not remand for additional sanctions.