ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Following his conviction in the Circuit Court of Marshall County of burglary of a building other than a dwelling, his sentence of seven years in the custody of the Mississippi Department of Corrections, and the imposition of a fíne, costs, and fees totaling $10,058.00, Ronnie Sanders now appeals. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In the early morning hours of November 12, 2007, the M & W Quik Stop in Marshall County, Mississippi, was burglarized. The store’s owner, Gus Armo, was contacted approximately 2:00 a.m. or 2:30 a.m. by the company that monitors the Quik Stop’s alarm system and was told that there was a break-in. Armo asked the alarm company to call the police and immediately headed toward his store. Armo arrived at the Quik Stop approximately twenty minutes later and looked for signs of a break-in. Looking through the store’s windows, Armo saw some of the store’s merchandise scattered across the floor. He immediately called law enforcement. While he was waiting for law enforcement to arrive, Armo saw something or someone moving behind the store, but it was too dark to determine who or what it was.
 

 ¶ 3. The deputy arrived approximately ten minutes later. Once inside, they discovered that the perpetrators of the burglary broke into the Quik Stop from the back of the store by cutting through the outside wall and interior Sheetrock. Surveying the damage to the store, Armo noticed that one of the two VCRs he kept in his office had been destroyed. But the second VCR, which was under his desk and used to record images from the store surveillance system, was still working.
 

 ¶4. During his testimony, Armo was shown various pictures taken by law enforcement. He stated that several cartons of Newport cigarettes were taken from the store. Further, he identified two filing cabinets located in his office where he kept rolled change that had been emptied. Armo was also shown a picture of the two cash registers in the Quik Stop. The picture showed that they were open with the cash trays pulled out, and they only contained loose coins. Armo stated that it was his practice to leave $150 in the registers after closing for the morning shift’s use and to keep the registers closed during the night. Finally, Armo was shown a photograph of the items recovered, which included: a 9mm pistol; two cartons of Newport cigarettes; several rolls of change; a ziploc bag containing cash bills; and other items. Armo stated that the recovered pistol was identified as belonging to him by using the serial number on the weapon; he further identified the recovered cash, rolled coins, and cartons of cigarettes as coming from his store.
 

 ¶ 5. Armo was not the first to arrive on the scene. Deputy Sheriff Michael Garner with the Marshall County Sheriffs Department testified that he received a call indicating that the alarm at the Quik Stop had been tripped. He was at the store within approximately two minutes of the call and proceeded to inspect the area. However, he did not see any signs of a break-in. Deputy Garner radioed back and told the dispatcher that nothing seemed out of the ordinary. However, when he left the store he noticed a gray Chevrolet van with Tennessee license plates parked along the side of the roadway approximately two or three hundred yards from the store. Since he
 
 *641
 
 did not see anything out of the ordinary at the Quik Stop, Deputy Garner initially dismissed the presence of the van as unremarkable and continued to patrol the county.
 

 ¶ 6. Approximately thirty minutes later, Deputy Garner received a call from the dispatcher relaying that Armo had called the sheriffs department; Armo reported to the sheriffs department that he was at the Quik Stop and he had observed someone running from his store. At approximately 2:30 a.m. or 3:00 a.m., Deputy Garner made his way back to the Quik Stop, while he drove to the store he looked for the gray van he had seen earlier. A few miles from the store, Deputy Garner saw the gray van traveling in the opposite direction, so he turned around to catch up with the van. Deputy Garner subsequently stopped the van.
 

 ¶ 7. Deputy Garner ordered the driver to exit the vehicle, and Sanders came around from the back corner of the passenger side of the van. Kevin Luster, Sanders’s cousin, subsequently exited the van from the driver-side door. Both men were ordered to the back of the van and also ordered to get on the ground. Deputy Garner testified on cross-examination that during this time he could not clearly see the passenger side of the van. At this point, two other deputies arrived to assist Deputy Garner. The deputies searched the van and surrounding area for evidence of the burglary. They found a black backpack approximately ten feet from the passenger-side door that contained a reciprocating saw, chisels, other tools, two cartons of Newport cigarettes, and several rolls of coins. Additionally, a 9mm Beretta pistol was found on the ground approximately thirty feet from the passenger-side door of the van. The deputies also found several loose paper bills under the van on the passenger side near the front tire. A search of the interior of the van yielded several ski masks, three hand-held radios, binoculars, and various tools.
 

 ¶ 8. On cross-examination, Deputy Garner stated that he did not see anyone throw the backpack, pistol, or money. Further, he stated that while he could not see the passenger side of the van, he could see the open field which the passenger side of the van faced, and he did not see anyone fleeing the scene through the field.
 

 ¶ 9. The van was subsequently towed to the impound lot of the sheriffs department. While there, Investigator Kelly McMillen and Deputy Garner thoroughly searched the van for additional evidence. In addition to the items already discussed, a large plastic container was found which contained additional tools such as sledge hammers, a jack, and small hand tools. Four gloves were also found in the van. Further, Investigator McMillen testified that while only two cartons of Newport cigarettes were recovered, Armo listed ten cartons of Newport cigarettes missing. Investigator McMillen next identified the black shirt and black pants that Sanders was wearing when he was arrested. Investigator McMillen stated that Sanders’s shirt appeared to have Sheetrock residue on the front and back of it. However, the substance was never tested. Additionally, Investigator McMillen identified what he characterized as “begger’s lice” on Sanders’s shirt, which he stated attaches itself to clothing when you go through a wooded area. Investigator McMillen testified that both the white residue and begger’s lice were also present on the pants Sanders was wearing when he was arrested.
 

 ¶ 10. The jury was then shown video surveillance of the interior of the Quik Stop that was recorded during the burglary. Investigator McMillen explained the activity on the surveillance video while it was shown to the jury. The video showed
 
 *642
 
 one individual dressed in all black, wearing a black hooded sweatshirt or jacket, entering the Quik Stop through the created hole in the wall, taking various items, destroying the alarm system’s wall-mounted panel, and leaving the store through the same hole. Investigator McMillen stated that the black hooded sweatshirt or jacket was never found. Additionally, although the identity of the burglar in the video could not be determined, it was Investigator McMillen’s opinion that the larger stature of the individual in the video excluded Luster, who was “a small man,” from consideration as the person in the video. Investigator McMillen testified that Sanders was more consistent in terms of body size with the individual shown on the video surveillance.
 

 ¶ 11. Sanders and his cousin, Luster, were jointly indicted for the burglary of the Quik Stop. On the second day of trial, during the State’s case-in-chief, and while the court had recessed for the noon lunch break, Luster decided to change his plea and pled guilty to accessory after the fact to the burglary. He was then called as a witness by the State. Luster testified that Sanders, who is Luster’s first cousin, and another man named Gregory Michaels picked Luster up in Memphis, Tennessee at approximately 10:00 p.m. on November 12, 2007, with the intention of drinking and socializing in the “Ole Miss area.” Luster stated that on the way back to Memphis, Sanders was driving; Michaels was in the passenger seat; and he was lying down on a mattress in the back of the van. The van stopped, and Sanders and Michaels got out. During direct examination, Luster stated that the pair were gone more than an hour before they returned; however, on cross-examination, he admitted that he did not know how long they were gone because he had drank so many alcoholic beverages that he had passed out. Luster stated that when they did return, he did not specifically see any of the items taken from the Quik Stop, but Michaels had several bags with him.
 

 ¶ 12. At this point, the trio drove off with Sanders driving and Michaels sitting in the front passenger’s seat. A short time later, Deputy Garner stopped the van and ordered its inhabitants to exit the vehicle. Luster testified that he told Deputy Garner about Michaels, but he was never questioned as to Michaels’s identity or where Michaels could be found.
 

 ¶ 13. Following the traffic stop and subsequent arrest of Sanders and Luster, both men were indicted for burglary of a building and tried as co-defendants in the Circuit Court of Marshall County. We note that prior to the beginning of Sanders’s trial, Sanders’s attorney did not move for a severance of Sanders from the trial of Luster. Apparently, both Sanders and Luster were out of jail on bond when the trial commenced. On the second day of trial, Sanders failed to make an appearance in court. The record shows that Sanders was admitted to the emergency room of the Bolivar County Hospital in Cleveland, Mississippi, at 8:04 a.m. on the morning of the second day of trial. Despite further attempts to locate Sanders, he could not be found, and the trial continued.
 
 [1]
 
 During the lunch break, Luster de
 
 *643
 
 cided to change his plea and pled guilty to being an accessory after the fact. Sanders’s defense counsel moved the trial court for a continuance and mistrial; however, both motions were denied. Following Luster’s plea and testimony as a witness for the State, Sanders was found guilty of burglary of a commercial building, sentenced to serve seven years in the custody of the MDOC, and ordered to pay costs, fees, and fines. After the trial court denied his post-trial motions, Sanders perfected his appeal, claiming only one trial court error.
 

 DISCUSSION
 

 WHETHER THE TRIAL COURT ERRED IN DENYING SANDERS’S MOTION FOR A CONTINUANCE AND MOTION FOR A MISTRIAL
 

 ¶ 14. In the middle of the second day of trial, Luster changed his plea from not guilty to guilty, and the State informed Sanders’s counsel that Luster would testify as a witness for the State. Sanders’s counsel moved the court for a continuance. He claimed a continuance was justified “based on the State having secured an additional witness that has not been discovered.” Sanders’s counsel explained: “I have not had time to speak with my client about this. I have not had time to check the background of the witness.” The trial court denied Sanders’s counsel’s motion. Sanders’s counsel immediately moved for a mistrial and argued that the fact that Luster had been a co-defendant and decided to plead guilty would prejudice Sanders in the eyes of the jury and deny him a fair trial. This motion was similarly denied. On appeal, Sanders argues that the trial court erred in denying his motion for a continuance. He claims that “the State violated the discovery requirements [of Rule 9.04 of the Uniform Rules of Circuit and County Court] by failing to disclose the additional witness prior to trial.”
 

 ¶ 15. The seminal case regarding violations of discovery rules is
 
 Box v. State,
 
 437 So.2d 19 (Miss.1983). The guidance set forth in
 
 Box,
 
 and its progeny, was subsequently codified in Rule 9.04 of the Uniform Rules of Circuit and County Court. Rule 9.04 states in pertinent part:
 

 (A) ... the prosecution must disclose to each defendant or to defendant’s attorney, and permit the defendant or defendant’s attorney to inspect, copy, test, and photograph
 
 upon written request and without the necessity of court order
 
 the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution:
 

 1. Names and addresses of all witnesses in chief proposed to be offered
 
 *644
 
 by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness....
 

 (I) ... If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
 

 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
 

 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
 

 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
 

 ¶ 16. Although trial courts enjoy a fair amount of discretion in whether to grant or deny a request for a continuance, the plain language of Rule 9.04 indicates that given a violation of the rule during the course of a trial a trial court’s discretion regarding the grant or denial of a continuance is replaced with a singular option that it “shall act,” absent unusual circumstances, according to the requirements of the rule. Therefore, given the mandate of Rule 9.04, our first inquiry is whether the State violated the provisions of Rule 9.04 in failing to inform Sanders prior to the middle of the second day of trial that Luster would testify for the State. Given the facts in the record, we find that there was no violation of Rule 9.04.
 

 ¶ 17. We initially note that although the State does not argue the fact, we neither find mention in the record, nor does Sanders provide proof that his trial counsel requested discovery from the State. Rule 9.04, as written, is not self-executing. It requires a defendant to make a written request for discovery materials the State may have. This fact alone could preclude this Court from reviewing the issue as it is the appellant’s “duty [to] insur[e] that the record contains sufficient evidence to support his assignments of error on appeal.”
 
 Oakwood Homes Corp. v. Randall,
 
 824 So.2d 1292, 1293 (¶ 4) (Miss.2002). Nevertheless, we address the merits of Sanders’s claim.
 

 ¶ 18. Prior to Luster’s decision to change his plea to guilty, his Fifth Amendment right not to testify prohibited the State from calling Luster to the stand. The record reveals that immediately after the mid-day recess ended, Luster’s attorney informed the trial court that Luster wished to change his plea to guilty. Obviously, this was the earliest point in time that the State had knowledge of Luster’s decision to plead guilty and, subsequently, knowledge that Luster would testify for the State. Sanders neither argues that the State had knowledge of Luster’s intentions prior to this point in time, nor does he claim that the State did not immediately inform Sanders’s attorney of the development as soon as it became known to the State.
 

 ¶ 19. In support of his argument that the State violated Rule 9.04, Sanders cites
 
 McCullough v. State,
 
 750 So.2d 1212 (Miss. 1999) and claims that it is as factually
 
 *645
 
 similar to the case at hand. In
 
 McCullough,
 
 the State used evidence of a prior act of Larry McCullough to impeach his testimony.
 
 Id.
 
 at 1217 (¶ 17). However, the evidence was not disclosed to McCullough until the day of trial, as the State claimed to have discovered the information that same morning.
 
 Id.
 
 The supreme court held that: “Since the defense was not presented with the evidence until the morning of trial, and McCullough requested a continuance which was denied, this Court finds prejudicial error.”
 
 Id.
 
 at (¶ 19). On its face, the supreme court’s holding would seem to benefit Sanders; however, the factual circumstances of the presentation of the evidence in question in both cases is distinguishable.
 

 ¶ 20. To shed light on why the facts of
 
 McCullough
 
 demanded a reversal based on the State’s violation of Rule 9.04 and the trial court’s subsequent denial of a continuance demanded by Rule 9.04, we discuss
 
 Fulks v. State,
 
 18 So.3d 803 (Miss.2009). In
 
 Fulks,
 
 Joshue Glenn was initially disclosed as a State witness who would testify that Tomarcus Fulks did not participate in the robbery he was charged with, but on the day before trial, the State informed Fulks’s counsel that Glenn would instead testify that Fulks was intimately involved in the robbery.
 
 Id.
 
 at 804 (¶¶ 2-3). Fulks’s attorney requested a continuance based on the fact that Glenn’s new version of events previously had not been disclosed by the State, but the requested continuance was denied.
 
 Id.
 
 at (¶ 3). In reversing Fulks’s conviction based on a violation of Rule 9.04, the supreme court noted that Glenn’s new testimony was known to the State some months before trial began and held that:
 

 as was so in
 
 Box
 
 and
 
 McCullough,
 
 our analysis in the case at bar necessarily depends on the fact that Glenn’s revised account of the night in question amounts to “previously undisclosed evidence.” These cases do not present situations in which, for example, a witness changes his story on the stand ... such testimony would not amount to “previously undisclosed evidence” because the State would have had no knowledge thereof to disclose.
 

 Id.
 
 at 806-7 (¶¶ 11, 14). In
 
 McCullough, Box,
 
 and
 
 Fulks,
 
 the State attempted to use “previously undisclosed” evidence in some form or another against a defendant without making a timely disclosure as required by Rule 9.04. Such was not the case at Sanders’s trial.
 

 ¶ 21. In a case in which the facts were similar to the case at hand, the supreme court found that there was no violation of Rule 9.04.
 
 Walker v. State,
 
 671 So.2d 581 (Miss.1995). In
 
 Walker,
 
 Alan Walker’s co-defendant and accomplice decided to change his plea to guilty two days before their trial began and to testify against Walker.
 
 Id.
 
 at 591. Similar to Sanders, Walker requested a continuance to “more adequately prepare for his testimony,” but the trial court denied the request.
 
 Id.
 
 On appeal, Walker argued that the State had violated the discovery rules and that the trial court was bound by the procedures for a violation of the discovery rules set forth in
 
 Box. Id.
 
 at 592. However, the supreme court held that
 
 “Box
 
 [was] inapplicable to Walker[’]s case since there is no assertion that the State withheld the fact of [the co-defendant’s] plea bargain or discovery materials.”
 
 Id.
 
 The supreme court further stated that “Walker admits in his brief that, [Presumably, the State gave notice immediately after the deal was struck with [the co-defendant].”
 
 Id.
 
 at 593.
 

 ¶ 22. As was the case in
 
 Walker,
 
 and distinguishable from
 
 McCullough, Box,
 
 and
 
 Fulks,
 
 Sanders does not argue that any statement or other information
 
 *646
 
 pertaining to Luster was withheld from him, and there is nothing in the record to indicate that Sanders was not given notice of Luster’s change of heart immediately after the State found out that he wished to plead guilty and would testify as a witness for the State. Furthermore, as will be discussed in more detail below, the record shows that Sanders had actual knowledge that Luster intended to testify in his own defense. Sanders does not argue or present any evidence that Luster’s testimony was different from what it would have been had he testified during the defense’s, rather than the State’s, case-in-chief. The record reflects that neither Luster’s nor Sanders’s attorneys moved the trial court for a severance of their trials. Generally, a motion for severance is justified when: the testimony offered by either defendant tends to exculpate himself at the expense of his co-defendant; a conflict of interest exists among the co-defendants; and the remaining evidence tends to infer guilt more heavily against one defendant.
 
 Adams v. State,
 
 851 So.2d 366, 375 (¶ 24) (Miss.Ct.App.2002). Logic dictates that in order to come to a decision that a severance was not necessary, the two defense attorneys involved must have discussed their respective client’s cases between themselves. This indicates that both attorneys knew enough about their co-defendant’s version of events and intentions to come to a reasonable and considered opinion as to whether it would benefit their client to be tried separately. The fact that no such request for severance was made speaks volumes as to Sanders’s trial counsel’s knowledge of Luster’s intent to testify and the content thereof of his intended testimony. It is clear that Sanders was not ambushed with Luster’s testimony, but only forced to endure its implications of his guilt earlier in the trial than expected. As such, we cannot say that the State violated any provision of Rule 9.04.
 

 ¶ 23. Furthermore, we cannot say the trial court abused its discretion in denying Sanders’s motion for a continuance. “The trial court has considerable discretion in matters pertaining to discovery, and its exercise of discretion will not be set aside in the absence of an abuse of that discretion.”
 
 Gray v. State,
 
 799 So.2d 53, 60 (¶ 26) (Miss.2001). Specifically, “[t]he decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice.”
 
 Simmons v. State,
 
 805 So.2d 452, 484 (¶72) (Miss. 2001). In considering whether the denial of the continuance was error, the supreme court has stated that “[t]he question of whether defendant had a reasonable opportunity to prepare to confront the State’s evidence at trial depends upon the particular facts and circumstances of each case.”
 
 Traylor v. State,
 
 582 So.2d 1003, 1006 (Miss.1991) (quoting
 
 Reuben v. State,
 
 517 So.2d 1383, 1386 (Miss.1987)).
 

 ¶ 24. In his brief to this Court, Sanders claims that he was the victim of a trial by ambush and did not have time to “review or prepare for the testimony of Luster.” Sanders further states in his brief, “Counsel for Sanders was not allowed any time to adjust and prepare for the testimony of Luster.” Additionally, during argument in support of his motion for a continuance, Sanders’s counsel stated that he had “not had time to check the background of the witness ... [and] had not had time to prepare for” the new evidence. However, Luster was a co-defendant and an alleged accomplice to the burglary. As implied above, it is an unreasonable suggestion that Sanders’s counsel would not have been thoroughly versed on Luster’s background, intent to testify, or intended testimony. Indeed, the chance
 
 *647
 
 that Luster would testify in his own defense was always a possibility. In fact, in the case at hand, it was more than a possibility. During Luster’s trial counsel’s opening statement, he stated:
 

 Also the evidence in this case will show that my client will take the stand and he wants to tell you what he believes happened and he wants to tell you that there was a third guy involved in this situation that he believes committed the crime and fled the scene, but you will hear it from him when he takes the stand and you will get to consider that.
 

 Furthermore, the record makes clear that months prior to the trial, Sanders’s attorney had knowledge that the State had approached Luster and offered a deal in exchange for his testimony. Specifically, prior to the trial beginning and outside the jury’s presence, Luster’s attorney made the following statement:
 

 Your Honor, may it please the Court, and for the record, I represent, as the Court knows, Kevin Luster. I just wanted it to be on the record that this past term of court this matter was previously set for trial. We watched the video and did a bunch of work on the case; and at that time, the State, kind of understanding that there were different defendants and different position[s] in this, the State approached Mr. Luster and I and made him an offer of a probationary deal in exchange for him testifying against Mr. Sanders. He and Mr. Sanders are cousins. They considered their options, and Mr. Luster at that time told me that he did not wish to testify against his cousin, and rejected the offer made by the District Attorney’s Office.
 

 It is apparent that Sanders had ample opportunity to prepare to confront Luster’s testimony. The fact that he was on the witness stand at the behest of the State rather than of his own accord is of no moment as neither the record nor Sanders’s brief suggests that Luster’s testimony would have been different either way. Sanders has made “no showing that he would have been better able to meet the prosecution’s evidence given more time. Even a wrongful denial of continuance, which is not present here, does not mandate reversal absent a showing of injury.”
 
 Walker,
 
 671 So.2d at 592 (quoting
 
 Morris v. State,
 
 595 So.2d 840, 844 (Miss. 1991)).
 

 ¶ 25. Under the facts and circumstances presented in this case, we find no error in the trial court’s denial of Sanders’s counsel’s motion for a continuance. Accordingly, this issue lacks merit.
 

 ¶ 26. THE JUDGMENT OF THE CIRCUIT COURT OF MARSHALL COUNTY OF CONVICTION OF BURGLARY OF A BUILDING OTHER THAN A DWELLING AND SENTENCE OF SEVEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND TO PAY A $2,000 FINE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MARSHALL COUNTY.
 

 LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. KING, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . Although Sanders does not raise on appeal the issue of whether the trial court erred in failing to grant a continuance because of Sanders's absence on the second day of trial, we will give some background as to Sanders's absence so as to illustrate the reasons for the trial court's denial of his continuance. The record shows that the trial court initially thought Sanders was in Bolivar, Tennessee, and requested that the Bolivar Police Department inquire into Sanders's condition at the hospital. Obviously, Sanders was not in Tennessee, and the Bolivar Police Department reported back to the trial court that Sanders
 
 *643
 
 was never a patient at the Bolivar County Hospital. The confusion was cleared up when a nurse from the Bolivar County Hospital faxed an outpatient record showing that Sanders was admitted at 8:04 a.m. after apparently being assaulted at some point, and at approximately 9:30 a.m., he was on his way to the court. However, the trial court noted that the Bolivar County Hospital was approximately two hours away and opined that Sanders had caught the “court flu” and never intended on making it to court on time as the second day of his trial was scheduled to begin at 9:00 a.m. The trial court did not grant the requested continuance, but the court did make concessions to accommodate Sanders's attorney under the impression Sanders would arrive soon. However, after returning from the lunch recess at 12:35 p.m., which was taken early in order to give Sanders time to get to court, Sanders still had not arrived, and the trial court found that Sanders had "either run off or he, otherwise, [was] deliberately trying to thwart the process.” Sanders never appeared for court that day. Sanders turned himself in four days later on February 23, 2009.